J-A10043-20

2020 PA Super 199

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| CLAIRE A. RISOLDI | : | |
| Appellant | : | No. 1487 EDA 2019 |

Appeal from the Judgment of Sentence Entered May 17, 2019
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0002487-2015

BEFORE: BOWES, J., SHOGAN, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.: **FILED AUGUST 18, 2020**

Claire A. Risoldi (Risoldi) appeals from the May 17, 2019 judgment of sentence imposed by the Court of Common Pleas of Bucks County (trial court) following her conviction by jury of dealing in unlawful proceeds, two counts of insurance fraud, theft by deception, criminal attempt—theft by deception, and conspiracy—theft by deception.[1]  After careful review, we affirm in part and vacate in part and remand for resentencing.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 5111(a)(1); 4117(a)(2); 3922(a)(1);  901(a); 903.

**I.**

We glean the following facts from the certified record.[2]  On October 22, 2013, Risoldi's home, known as "Clairemont," caught fire.[3]  This was the third fire at Clairemont in five years, with one prior fire in 2009 and one in 2010. No one was home when the 2013 fire began, though members of the Risoldi family returned to Clairemont during the firefighting efforts.  Four fire departments responded to extinguish the fire and additional fire companies provided water to the efforts.  The fire was concentrated in the attic of the home with many firefighters from the various companies coming in and out of the home to fight the fire.

After the fire, the Buckingham Police Department stationed several patrol officers outside of Clairemont overnight to ensure that there was no unauthorized entry into the building.  However, restoration crews began working immediately to remove contents from the house and prevent further damage, including during that night.

Clairemont suffered significant damages from fire and water that required costly rebuilding as well as replacement or refurbishment of much of its contents.  Clairemont and its contents were insured through AIG Insurance

---

[2] As Risoldi's issues relating to the sufficiency of the evidence concern only the fraudulent claims for drapes and jewelry, our review of the facts focuses on those issues.

[3] The cause of the fire was determined to be accidental.

(AIG). Clairemont was covered by a homeowners' insurance policy for damage to the structure and its contents, and all residents of Clairemont were beneficiaries to the policy. In addition, Risoldi carried a collections insurance policy that provided additional coverage for certain enumerated pieces of jewelry. At the time of the fire, 55 pieces were covered by the collections policy. Following the fire, Risoldi and her family submitted claims to AIG under both policies. They sought coverage for the structural damage and rebuilding of Clairemont, pieces of jewelry that allegedly disappeared from the house during the fire, replacement costs for over $2 million in drapes that had been destroyed by the fire, restoration costs for a mural that had been painted on one of the ceilings as well as Alternative/Additional Living Expenses (ALE) that they incurred while Clairemont was being rebuilt.

During the course of investigating the Risoldis' claims, AIG became suspicious that some of the costs for which the Risoldis sought reimbursement were inflated. Relevant to this appeal, AIG believed that the Risoldis had falsely claimed that they spent $1.2 million to replace drapes following the 2010 fire and were seeking an even higher amount to replace the drapes again after the 2013 fire. In addition, AIG was skeptical of the Risoldis' allegation that over $10 million worth of jewelry had been stolen from Clairemont during the firefighting efforts. After a lengthy investigation by the Office of the Attorney General (OAG), Risoldi was charged on January 22, 2015, with

various counts related to insurance fraud, theft, conspiracy, receiving stolen property and dealing in unlawful proceeds.[4]

The Commonwealth filed a motion seeking to bypass the preliminary hearing on February 4, 2015, and it was denied on March 3, 2015. The preliminary hearing was subsequently held from March 30 through April 7, 2015. After numerous pre-trial motions and proceedings, the Commonwealth filed a motion to recuse the trial court on April 18, 2016. The trial court denied the motion to recuse on August 1, 2016, to which the Commonwealth filed an appeal from that decision on August 23, 2016. Upon review, we affirmed the trial court's decision and subsequently denied reconsideration. ***See Commonwealth v. Risoldi***, 2677 EDA 2017 (Pa. Super. Aug. 15, 2017), *recons. denied*, Oct. 19, 2017 ("***Risoldi I***"). The case was remanded to the trial court on December 1, 2017.

On remand, co-defendant Carl Risoldi (Carl) filed a motion to dismiss pursuant to Rule 600 and Risoldi filed a motion to adopt that motion to dismiss. The trial court decided the issues based on the briefs of the parties and denied the motion on April 23, 2018. Risoldi proceeded to trial on January

---

[4] Other family members and associates were also charged with various crimes related to the insurance claims. All of these cases were disposed of separately.

15, 2019, and on February 5, 2019, the jury found her guilty of the above-mentioned charges.[5]

The verdict form allowed the jury to make specific factual findings regarding the criminal conduct supporting the convictions for count 2, insurance fraud, and count 4, theft by deception. The verdict form appeared as follows:

**Count 2 – Insurance Fraud**

Fire of October 22, 2013
Period from October 22, 2013 forward

If you find the defendant guilty of Count 2, circle what the fraudulent conduct was:

a. drapery claim and/or
b. mural claim and/or
c. alternative living expense claim and/or
d. guaranteed rebuilding cost submittal

**Count 4 – Theft by Deception**

Fire of October 22, 2013
Period from February 22, 2014 forward

If you find the defendant guilty of Count 4, circle what the fraudulent conduct was:

a. drapery claim and/or
b. alternative living expense claim

---

[5] Risoldi was found not guilty of three counts of Receiving Stolen Property, 18 Pa.C.S. § 3925, which were based on insurance claims she had made in 1984, 1993 and 2002.

For count 2, the jury found Risoldi guilty and circled the drapery claim, mural claim and ALE claim as the fraudulent conduct. For count 4, the jury found Risoldi guilty and circled the drapery claim and the ALE claim as the underlying conduct. Through a special interrogatory on count 4, the jury found that the value of money fraudulently obtained for the drapery and ALE claim was $2,750,000. The OAG charged Risoldi with a separate count of insurance fraud related only to the jewelry claim and a count of criminal attempt—theft by deception related to the jewelry claim. Risoldi was found guilty of both of those counts, and on the count of criminal attempt—theft by deception, the jury found that Risoldi had attempted to obtain $10 million.

We now turn to a more detailed recitation of the evidence adduced at trial, particularly with regard to the jewelry and drapes claims.

**A.**

Risoldi resided at Clairemont with her son, Carl, his wife, Sheila, and their children.[6] On October 16, 2013, less than a week before the fire, Risoldi was married at a wedding ceremony held at Clairemont. Risoldi had a collection of jewelry that she stored in a safe-deposit box at a local bank. On the day of the wedding, Carl retrieved the collection from the bank and brought it back to Clairemont so that Risoldi could wear some of the pieces.

---

[6] To avoid confusion, we refer to other members of the Risoldi family by their first names.

On the day of the fire, Carl intended to leave work early to return the jewelry to the bank, which he left in white tote bags labeled "Risoldi Law Offices"[7] on a chair in the foyer of Clairemont. Risoldi said that she noticed that the tote bags were missing from the foyer immediately after the fire.

Notably, Risoldi had left Clairemont to run errands shortly before the fire broke out. Even though she left the jewelry sitting in the foyer at Clairemont, she did not arm her alarm system when she left the house. She said that she never armed the alarm system when she ran errands. Additionally, when investigators asked where Risoldi had gone that morning, they learned that her errands had taken her to an area only a couple minutes from the bank where her safety-deposit boxes were located.

Lieutenant John R. Landis of the Buckingham Police Department, a long-time friend of the Risoldi family, was one of the officers to respond to the scene of the 2013 fire. He arrived on scene and stayed for approximately two hours, during which he spoke with all of the members of the family. While he was at the scene, none of the Risoldis told Lieutenant Landis about the jewelry in the foyer or asked him to retrieve it. A couple of days after the fire, Risoldi called Lieutenant Landis upset that items in the house had been moved and that the house was a mess but did not report any missing jewelry at that time.

---

[7] Risoldi's daughter, Carla, is an attorney and owns the practice.

Approximately ten to fourteen days after the fire, Risoldi called Lieutenant Landis again. She said that her private investigator was looking into the fire and that a bag of jewelry that had been left in the foyer had been moved to a bathroom. She indicated that some of the jewelry was now missing but that they had found other pieces throughout the home. She did not provide the value of the missing jewelry. Lieutenant Landis asked Risoldi if she was reporting a crime. Risoldi responded that she was not prepared to report the missing items as a crime but that her insurance company and auditor were looking into it. Lieutenant Landis advised her to create an inventory of the pieces to report as missing property to the police.

Risoldi called Lieutenant Landis a third time and asked him to meet with her at her daughter's law office to review some interviews her private investigator had conducted with neighbors following the fire. At that meeting, Risoldi again did not report the missing jewelry and Lieutenant Landis told her that he could not be involved with any investigation related to the fire because of his personal relationship with the family.

Finally, Risoldi called Lieutenant Landis once again on the day before Thanksgiving, approximately one month after the fire, and asked how to report a theft. For the first time, Risoldi told Lieutenant Landis that she was missing $2.8 to $3 million in jewelry after the fire, but had not reported it sooner because her private investigator and insurance company had told her not to report the theft until she was sure she could not find the jewelry herself.

Lieutenant Landis told her to report that theft immediately to the police and that he could not believe that her insurance company had not wanted her to make the report as soon as the theft occurred. He advised her that he could not file the report himself because of his personal relationship with the family, that he was not an investigator who would look into this type of claim, and that he was on medical leave from the department. However, he told her that the investigators would be back at the department the day after Thanksgiving and she should make the report as soon as possible.

Risoldi waited to report the missing jewelry to the police department until December 16, 2013, nearly two months after the fire. Chief Steven Daniels of the Buckingham Police Department took the report. She initially reported that the estimated value of the stolen jewelry was $7 million, but at subsequent meetings, reported the value of the jewelry at $8-10 million and then $12 million. Risoldi provided Chief Daniels with a list of jewelry that had been stolen. She said that the jewelry had been in two tote bags in the foyer, and she had not been allowed into the house to retrieve the bags while the firefighting efforts were ongoing. She reported that she and her husband had later found one of the bags behind a grandfather clock in the house and the other was found in one of the bathtubs. They found some pieces of jewelry in various spots throughout the house and some pieces still in the tote bags, but many of the jewelry boxes had been emptied.

The day after the fire, Anthony Amoroso (Amoroso), a general adjuster for AIG, met with the Risoldis at Clairemont to conduct a preliminary walkthrough. While at the property, Amoroso asked Carl and Carla whether there were any valuables, including the jewelry insured by the collections policy, which should be removed for safekeeping. At that time, none of the Risoldis mentioned the missing jewelry. However, later that day, Amoroso received a text message from Carl that said, "I am not going to panic just yet, but one of the two bags of jewelry is missing. I am still looking for it." Reproduced Record (R.R.) at 1919a. Risoldi did not ask Amoroso to file a claim for the jewelry and the case was transferred to insurance agent James O'Keefe (O'Keefe) the next day.

Prior to reporting the theft to the police department, Risoldi and her family members spoke with O'Keefe on multiple occasions. According to O'Keefe, the Risoldis' collections policy provided coverage for over $10 million worth of jewelry at the time of the fire. Upon reviewing a history of the collections policy, O'Keefe found that that between July and September of 2013, the Risoldis had increased the number of items covered by the collections policy from two items, valued at $105,000, to 55 items, valued at approximately $10.9 million.

O'Keefe met with the Risoldis at Clairemont around October 28, 2013, to look at the damage caused by the fire and the water. At that time, the Risoldis mentioned that some jewelry was missing but said that they were still

looking for it. O'Keefe met with the family again in mid-November, brought a list of the covered jewelry, and asked the family if any of the covered items were among those missing after the fire. At that time, Risoldi identified several items, each covered for over $1 million, which were missing. O'Keefe immediately told the Risoldis to file a claim given the magnitude of the loss.

In late November 2013, approximately one month after the fire, Carl emailed O'Keefe to notify him that the Risoldis would be filing a claim of loss under the collections policy. O'Keefe initiated the claim, but the Risoldis did not provide him with an exact list of the missing items until the end of December 2013. Because the Risoldis then reported a $9-10 million loss, O'Keefe became concerned about whether an investigation into the alleged theft was taking place. He contacted the Buckingham Police Department and the Bucks County District Attorney and learned that both entities had a conflict of interest that prevented them from investigating the loss.[8] The District Attorney had referred the matter to the state police, which in turn referred the case to the OAG.

_____

[8] Chief Daniels, who took the initial report on December 16, 2013, was also a volunteer with the Midway Fire Department, which had participated in extinguishing the fire at Clairemont. Chief Daniels was not present at the fire. While the record is not clear regarding the conflict of interest in the District Attorney's Office, Risoldi was prominent in the Bucks County Republican party and hosted many fundraisers for the party at Clairemont. Because of these ties, the entire Bucks County Court of Common Pleas bench recused itself from the case, and Senior Judge Thomas G. Gavin from Chester County was assigned to preside over the matter.

Based on the timing of the purported theft, the jewelry would have had to been taken by one of the firefighters who responded to the fire. David Shapp, a Battalion Chief at Midway Volunteer Fire Company, was one of the first firefighters to respond to the fire and had established command of the scene. He reported that including ambulance personnel, firefighters and police, between 40 and 50 individuals had reported to Clairemont during the fire. Chief Shapp recorded the front of the building with his cell phone, which was mounted on the dashboard of his truck, for 40 minutes upon arriving on the scene. The video did not show anyone leaving the building with a white tote bag, nor did Chief Shapp observe a white tote bag in the foyer when he entered as one of the first responders on the scene. In addition, Risoldi called 17 firefighters as witnesses at trial, and all of them testified that they did not notice any white tote bags on the chair in the foyer in the course of performing their duties, as they were focused on fighting the fire.

In an Examination Under Oath (EUO) conducted by AIG as part of its investigation in March 2014, Risoldi told O'Keefe that she had been the last person to leave Clairemont before the fire and that she believed that the firefighters had taken the jewelry. She said several loose pieces of jewelry were found strewn about the home after the fire, and she believed that a firefighter removed jewelry from the boxes to conceal it when smuggling it out of the home. Risoldi showed O'Keefe the two Risoldi Law Offices tote bags that she had used to hold the jewelry and which she had found hidden in the

home after the fire. O'Keefe inspected and photographed the bags and noted that they did not have any watermarks from the firefighting efforts. The jewelry boxes that had been in the bags also did not show any water damage or fingermarks.

Risoldi and her family submitted a formal proof of loss under the collections policy in September 2014, claiming over $10 million for the missing jewelry that had been covered under the policy.[9] Of the 55 items that were covered by the collections policy, Risoldi filed her claim for 25 items. AIG subsequently gave the OAG the documentation Risoldi had submitted when she initially sought coverage for these pieces. When Risoldi added scheduled jewelry to the collections policy, she submitted appraisals to establish the value of the scheduled pieces. Some of appraisals were from Lauria Jewelers and had been conducted in April 2013. However, many of the appraisal forms misspelled the word "jewelry" as "jewelery." *Id.* at 258a-59a. Some of the appraisals also misspelled Risoldi's first name. Risoldi told AIG that the Lauria Jewelers appraisals had taken place at Clairemont, and she had taken the jewelry out of her safety-deposit boxes to allow the appraiser to inspect them. However, bank records revealed that Risoldi had not visited the safety-deposit boxes in April 2013.

---

[9] AIG ultimately denied the jewelry claim, citing fraud and misrepresentation. *Id.* at 203a.

In November 2014, Special Agent Luis Gomez of the OAG executed a search warrant at three residences owned by the Risoldis. At the home where Risoldi was living, the investigators seized and catalogued a significant amount of jewelry. In Risoldi's home office, Special Agent Gomez found appraisals from Fairless Hills Auction Incorporated (Fairless Hills) and insurance paperwork. Some of the appraisal forms were filled out and signed, some of them had areas with whiteout, and some were completely blank. In addition, there were photocopies of appraisal forms that were blank but for the appraiser's signature at the bottom. There was a form with the word "appraisal" glued to the bottom, as well as photocopies of that form so that the word did not appear glued to the paper. Investigators found a catalogue of jewelry and several cutout pictures of jewelry. There were several appraisal forms with Sheila's name and a photograph of the appraised jewelry, as well as photocopies of those appraisals with the photographs removed. Finally, investigators recovered a book titled "Insult to Injury, Insurance, Fraud, and the Big Business of Bad Faith."

Agent Steven Gray of the FBI also executed search warrants at Fox Chase Bank and Lauria Jewelers during the course of the investigation into the insurance claims. At the bank, Agent Gray recovered deposit paperwork and signature cards associated with the Risoldis' safety deposit boxes, as well as jewelry that was located in the boxes. In the list of items that Risoldi reported stolen in her insurance claim under the collections policy, she included a

diamond engagement ring that was purchased at Lauria Jewelers. During his search at Lauria Jewelers, Agent Gray did not find a receipt for this purchase, but he did find other receipts for purchases by Risoldi. He recovered a blank appraisal form and a single appraisal completed for Risoldi. The appraisal seized directly from Lauria Jewelers spelled the word "jewelry" correctly.

In her EUO following the 2013 fire, Risoldi told AIG that all of the stolen jewelry had been given to her by her late husband. At trial, the Commonwealth presented testimony regarding three insurance claims for stolen jewelry that Risoldi had filed in the past.[10] The first claim related to a burglary in 1983, and the insurance company had paid Risoldi $120,000 for stolen jewelry. The second claim related to a theft that occurred in 1993. Risoldi had filed a claim seeking $111,000 for jewelry, and the company ultimately paid her $80,000. The third claim for stolen jewelry was filed in 2000, and Risoldi was paid $136,000 for the jewelry. In these past claims, Risoldi had participated in EUOs and told the insurance companies that the stolen pieces were irreplaceable heirlooms and gifts from her husband, and that all of the jewelry in her home had been stolen.

The Commonwealth then presented testimony from accredited appraiser Donald Palmieri (Palmieri), who testified at trial as an expert gemologist.

---

[10] The Commonwealth charged Risoldi with one count of Receiving Stolen Property related to each of these three past insurance claims. 18 Pa.C.S. § 3925. The jury found Risoldi not guilty as to these counts.

Palmieri inspected hundreds of pieces of jewelry that the OAG seized from the Risoldi family during its investigation, as well as the appraisals and other documents that were submitted to AIG in support of the 2013 claim and to other insurance companies in support of Risoldi's past jewelry claims. He also examined the jewelry that Risoldi stored in safety-deposit boxes at her bank. Palmieri testified that there are generally no specific legal standards that must be met for a person to become a jewelry appraiser or to issue a legitimate appraisal, though some insurance companies have minimum standards that appraisals must meet.

Palmieri also visited Lauria Jewelers to inspect its equipment, as it had issued many of the jewelry appraisals Risoldi submitted in support of her claim. After viewing the equipment at Lauria Jewelers, Palmieri opined that the business did not have adequate equipment to perform accurate jewelry appraisals. He also noted that many of the appraisals issued by Lauria Jewelers did not include photos of the pieces that were appraised.

Palmieri inspected the jewelry that had been in Risoldis' possession and compared the pieces to documents identifying jewelry that had previously been reported stolen. He used the weights and descriptions of the jewelry from the appraisals to determine if any of the pieces were among those seized from Risoldi. He also tested the metal in the pieces to determine the precious metal content and counted the gemstones in each piece. Through his inspection of the jewelry and documents, Palmieri found a total of 42 pieces

that had previously been reported stolen and subject to insurance claims. Some of the items had been claimed following multiple thefts, and others were scheduled on multiple insurance policies between 1983 and the 2013 fire. Palmieri valued everything he inspected, collectively, at $400,000, and opined that the total collective retail value of the pieces was around $1.5 million. He did not find any piece of jewelry individually worth over $1 million, and he believed that one of the most valuable pieces he inspected was a diamond bracelet worth $8,000.

On cross-examination, Palmieri admitted that there were some discrepancies between the descriptions of items that were previously reported stolen and items he examined. For example, Palmieri inspected a bracelet that had 139 brilliant cut diamonds which he believed had been previously claimed as stolen. However, paperwork associated with the claim listed a bracelet with 138 full-cut round diamonds. Despite the discrepancy, Palmieri opined based on the weight of the bracelet and the information in the prior appraisal that the bracelet he inspected was the one reported stolen in a previous claim. Palmieri also conceded that some of the items could have been repurchased in the years following the thefts, and he could not say with certainty that the items he examined were the ones that had been reported stolen previously.

In her defense, Risoldi presented testimony from Norbert Neumeister (Neumeister), an expert in forensic analysis of photographs. As noted **supra**,

the firefighters testified that on the day of the fire, they did not notice a white tote bag in the foyer at Clairemont. Neumeister analyzed a cell phone photo that was taken of the front of Clairemont at 1:26 p.m. on the day of the fire while the firefighting efforts were in progress. The front door of Clairemont was open and Neumeister analyzed and clarified the photograph to show what was beyond the doorway. Neumeister opined that there was a white object or area in the foyer.

Orlando Alcantara (Alcantara), a general contractor who worked on the restoration efforts at Clairemont following the fire, also testified on behalf of Risoldi. He testified that Risoldi was upset about the missing jewelry after the fire and spoke to him about it on several occasions. While Alcantara was working in the attic of Clairemont, he recovered several empty Rolex boxes and a Ferrari watch, which he immediately reported to Risoldi. In addition, one of the other workers at Clairemont recovered a diamond ring on the floor in the sitting room. Carl later testified that the Ferrari watch that Alcantara had recovered in the attic had been sitting on the dresser in his bedroom before the fire.

Finally, Carl testified on his mother's behalf. Carl recalled that on the day of Risoldi's wedding in 2013, Risoldi asked him to retrieve all of the jewelry from the family's safe-deposit box at the bank. Carl went to the bank and filled two white Risoldi Law Offices tote bags with jewelry boxes and jewelry to bring back to Clairemont. Less than a week later, on Monday, October 21,

2013, Carl intended to return the jewelry to the safe-deposit boxes. However, he had to stay late at work and decided to return the jewelry the next afternoon. Carl testified that when he left for work on the day of the fire, the tote bags containing the jewelry were on chairs in the foyer of Clairemont.

Carl testified that when he learned of the fire, he rushed home and arrived at Clairemont while the fire departments were still working on extinguishing the fire. He testified that he and Risoldi informed the fire chief and Sergeant Landis that there was a lot of expensive jewelry in the foyer, but they were told that they were not allowed to retrieve it. Carl then attempted to enter Clairemont through a back door to get the jewelry, but was again stopped by police. The police did help Carl move some of his expensive collectible vehicles out of the garage, as they could have been harmed by the fire.

Carl testified that once the family was permitted to reenter Clairemont, the house was chaotic and there was "total destruction" from the water damage. *Id.* at 2471a-75a. The tote bags were no longer in the foyer and he and Risoldi's husband searched the house for them. They located one bag in a bathtub and another behind a grandfather clock. Some, but not all, of the jewelry had been taken out of the tote bags and the jewelry boxes that were inside. Carl gave the bags to Risoldi and eventually O'Keefe inspected them as well. AIG did not perform any testing for DNA or fingerprints on the bags. Carl confirmed that he did not make a formal claim to AIG until the end

of November, and the police report was not filed until December 16, 2013. However, he said that he and Risoldi had told Sergeant Landis about the missing jewelry much earlier.

Carl testified that the Risoldis did not add all of their jewelry to the collections policy because it would have been cost prohibitive. They identified certain pieces that were worn more often to be added to the policy. AIG accepted their premium and bound the insurance policy based on the information that Carl and the Risoldis provided. Claire provided some appraisals for the pieces, but Carl testified that the insurance company had not requested them and did not ask to view or photograph the jewelry before binding the policy.

**B.**

After all three fires at Clairemont, Risoldi filed insurance claims for replacement of a significant amount of drapery, asserting that she had purchased the drapes from Summerdale Mills Fabric and Home Decorating Center (Summerdale). AIG had paid the Risoldis a total of approximately $1.8 million for damage following the 2009 fire and $8.9 million following the 2010 fire. *Id.* at 165a. Of those amounts, $250,000 in 2009 was paid to cover damage to drapes at Clairemont, and $1.2 million was paid in 2010 to cover damage to the drapes. *Id.* at 166a. After the fire in 2010, Amoroso repeatedly requested receipts for the drapes that were replaced after the 2009 fire. Risoldi complained to Amoroso that she had not been paid the full

replacement costs for the drapes after the 2009 fire, but never provided him with receipts confirming the replacement costs. The OAG suspected that despite receiving $1.2 million from AIG after the 2010 fire to replace the drapes, Risoldi had not actually replaced the drapes.

Following the 2013 fire and prior to the initiation of charges against Risoldi and her family, AIG paid the Risoldis approximately $7.5 million for damage to the structure of Clairemont, $2 million for the contents, and almost $1 million for ALE. *Id.* at 170a-71a. In January 2015, Risoldi and her family submitted a proof of loss binder, including a verified statement, enumerating the various losses to Clairemont and its contents that they wished to claim under their policies. The binder included voluminous receipts documenting what the Risoldis had spent in various areas, including on replacement drapes from Summerdale. The Risoldis requested an additional $5.2 million in their homeowners' claim to cover damage to the structure of Clairemont, and an additional $3.4 million to cover damage to the contents. *Id.* at 175a. They specifically requested approximately $2.3 million to cover damage to drapes. *Id.* at 166a.

When Risoldi requested $2.3 million following the 2013 fire to again replace the drapes through Summerdale, AIG and the OAG began investigating whether Risoldi had, in fact, replaced the drapes in 2010 for the amount she had claimed from AIG. In the course of the investigation, Special Agent Gomez served a search warrant on Summerdale seeking receipts for all

work Summerdale had performed for Risoldi at Clairemont. He recovered purchase requisition forms and installation sheets for the Risoldis. He recovered some receipts reflecting prices for various draperies and furniture, but did not find invoices totaling over $1 million worth of the fabrics and drapes. In addition, he found a letter from 2011 providing an estimate of $1.2 million for replacing drapery and furniture at Clairemont, but did not find any invoices to substantiate that an order had been placed because of the estimate.

When Risoldi submitted her proof of loss in 2015 for the homeowners' policy claims, she included numerous receipts for the drapes that were allegedly purchased from Summerdale after the 2010 fire. However, the header on the receipts misspelled "Summerdale" as "Summerdal." *Id.* at 241a. Upon reviewing these receipts, Special Agent Gomez determined that they did not match any of the documents recovered directly from Summerdale. In addition to the misspelling of "Summerdale," the receipts provided by Risoldi differed from the documents seized from Summerdale because they did not contain order numbers, order dates, installation information, transaction numbers or the name of the salesperson.

During her case-in-chief, Risoldi called Thomas Kiosewski (Kiosewski),[11] an installer from Summerdale, to testify regarding the work he did at Clairemont after the 2009 and 2010 fires. Kiosewski testified that the drapes in Clairemont were significantly damaged by smoke and water during the 2010 fire. He testified that the Risoldis had selected many expensive fabrics for their home, and that the drapery installation was one of the most complicated jobs he had ever done. He made at least 20 trips to Clairemont to complete the job, and while he did not know exactly how much the job had cost, he was confident that a single bedroom had cost around $60,000 to $70,000. However, on cross-examination, Kiosewski reviewed the receipts that had been seized directly from Summerdale and confirmed that they did not total over $1 million worth of drapes and labor following the 2010 fire.

Carl also testified that all of the drapes that were damaged during the 2010 fire were replaced by Summerdale. The drapes had been destroyed and could not have been cleaned and rehung. Carl reviewed photographs that depicted various rooms in Clairemont before and after the fire, showing the differences in the drapes. He testified that following the 2013 fire, the contents of Clairemont had been boxed and stored in a large warehouse by individuals working in the house. Carl attempted to find Summerdale receipts

_____

[11] We note that the parties in their briefs spell the witness's name as "Kosiewski." We utilize the spelling that is reflected in the transcript of the trial court proceedings.

in the warehouse and he located the receipts that were submitted to AIG after several hours of searching. He was not certain that he found all of the Summerdale receipts but he submitted the ones that he was able to locate.

**C.**

In further investigating the insurance claims, the OAG sought to establish that Risoldi's spending was extravagant and unsustainable without the insurance proceeds that she had received over the years. A forensic accountant at the OAG, Monique Ericson (Ericson), testified as an expert at trial. She testified that she analyzed 47 accounts across eight banks as well as numerous Risoldi family credit cards and loan statements. Ericson first determined that Risoldi's ordinary income, meaning the income that she received on a regular basis, was $1,500 per month from Social Security and $160 per month from a pension account. In addition, Carl had an ordinary income of $70,000 annually. These ordinary incomes accounted for approximately 3.84% of the Risoldis' spending. Ericson confirmed that Risoldi received $1.7 million from AIG after the 2009 fire and a total of $8.8 million from AIG over the course of several years after the 2010 fire. Ericson conceded that her analysis of Risoldi's income and spending only accounted for the money that was deposited into and spent from the bank accounts and that she had no knowledge of any large stores of cash that the Risoldis might have had access to.

In reviewing the bank accounts for the period between 2009 and 2018, Ericson found expenditures totaling approximately $191,000 on draperies and fabrics. For the years between 2009 and 2013, she found jewelry purchases totaling approximately $830,000. She opined that Risoldi did not have the ability to purchase $10 million worth of jewelry during that period. Ericson noted that prior to the 2013 fire, the Risoldis had taken cash advances on credit cards, and she believed that they were "strapped for cash." *Id.* at 1506a.

To rebut testimony regarding her finances, Risoldi called Edmondo Crimi (Crimi), an antique dealer, to testify on her behalf. Crimi testified that he had known Risoldi and her family for approximately 40 years and had sold her antiques throughout that period. He estimated that he had sold her between $4 and $7 million worth of antiques in total and he had participated in restoration work for Clairemont through AIG after the 2009 and 2010 fires. Crimi said it was not uncommon for Risoldi to pay for pieces in cash, and that over the years, she had paid him between half a million and a million dollars in cash for various items.

Finally, Carl testified that his father, Risoldi's late husband, had been a successful commercial contractor for many years. As a result, the family was well off and his father and Risoldi had kept a significant amount of cash in a safe in their home. While he did not know how much money was kept in the safe, he testified that it was "a lot" and had "filled a safe." *Id.* at 2416a-17a.

In addition, in the years preceding the 2013 fire, Carl said he had observed Risoldi take at least $100,000 in cash out of the safe.

**D.**

Following her convictions, the trial court sentenced Risoldi on count 1, dealing in unlawful proceeds, to 11.5 to 23 months' incarceration. On count 4, theft by deception, and count 5, criminal attempt—theft by deception, the trial court sentenced Risoldi to 11.5 to 23 months' incarceration to be served concurrently to the sentence at count 1. On counts 2 and 3, insurance fraud, the trial court sentenced Risoldi to 3 years of probation, with each sentence to be served consecutively to the period of incarceration. On count 9, criminal conspiracy, the trial court imposed an additional consecutive sentence of 2 years' probation. Thus, Risoldi was sentenced to an aggregate term of 11.5 to 23 months' incarceration, followed by eight years of probation. The trial court also imposed fines and court costs and ordered Risoldi to pay restitution to AIG of $10,428,428.13, which was the full amount that AIG had paid to Risoldi for her all of claims following the 2013 fire.[12] Risoldi filed a timely motion to reconsider the restitution portion of her sentence and a notice of

---

[12] The OAG had seized Clairemont, as well as bank accounts and other assets, during the pendency of the criminal case. The OAG had sold Clairemont by the time of Risoldi's sentencing hearing, and the trial court ordered that the proceeds of the sale be applied first to the court costs, and then toward restitution. In addition, $490,000 from one of Risoldi's seized bank accounts was applied toward the restitution.

appeal on the same day. The trial court denied the motion to reconsider.[13]

The trial court and Risoldi have complied with Pa.R.A.P. 1925.

Risoldi raises five issues on appeal, which we have renumbered for ease of disposition:

> 1. Whether Mrs. Risoldi's right to a speedy trial was denied by the Commonwealth taking an appeal to this Court seeking recusal of the trial court judge for no valid reason?
>
> 2. Whether the evidence was insufficient as a matter of law to sustain the convictions in connection with the drapes claim, as the Commonwealth failed to call an essential witness and as a result the conviction based on surmise, theory and conjecture?
>
> 3. Whether the evidence was insufficient as to the jewelry claim conviction as there was no evidence presented that the jewelry, as stated by defense witnesses, was not placed on a chair in the house and gone after the fire, therefore, the conviction was based on theory, conjecture and surmise?
>
> 4. Whether the Trial Court erred in denying the defense motion for a mistrial after the Commonwealth impermissibly shifted and commented on the burden of proof by asking defense witness, Thomas [Kiosewski], on cross examination if the defense had witnesses ready to testify that the drapes were purchased?
>
> 5. Whether the restitution portion of the sentence was illegal, because it was unauthorized by statute, and the trial court used contractual (civil) law to determine criminal restitution?

---

[13] We note that Risoldi's notice of appeal was premature, as it was filed before the trial court ruled on the post-sentence motion. Because the trial court denied the post-sentence motion without a hearing nine days later, we treat Risoldi's notice of appeal as being filed after the entry of the order denying her post-sentence motion. **See Commonwealth v. Ratushny**, 17 A.3d 1269, 1271 n.4 (Pa. Super. 2011).

*See* Risoldi's Brief at 9-10 (renumbered). We address each issue in turn.

## II.

Risoldi first argues that the trial court abused its discretion in denying her motion to dismiss the charges against her pursuant to Pa.R.Crim.P. 600 (Rule 600).[14] She alleges that two specific periods of Commonwealth delay resulted in her trial beginning over 365 days after the criminal charges were filed: first, the Commonwealth's February 4, 2015 motion to seeking to file the criminal information without a preliminary hearing, and second, the Commonwealth's interlocutory appeal of the trial court's denial of its recusal motion. We address each period of delay.[15]

---

[14] Our standard of review in a Rule 600 issue is whether the trial court abused its discretion. Our scope of review when determining the propriety of the trial court is limited to the evidence in the record, the trial court's Rule 600 evidentiary hearing, and the trial court's findings. We must also view the facts in the light most favorable to the prevailing party. . .

***Commonwealth v. Lewis***, 804 A.2d 671, 673 (Pa. Super. 2002) (citations omitted).

[15] In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court found that Risoldi had waived her Rule 600 claim by failing to file a written motion in the trial court. *See* Trial Court Opinion, 7/23/19, at 4-5. Our review of the record reveals that co-defendant Carl filed a Motion to Dismiss Pursuant to Rule 600 arguing for dismissal based on the two above-mentioned periods of delay. Risoldi then filed a Motion to Adopt Carl Risoldi's Motion to Dismiss Pursuant to Rule 600, and in its opinion resolving the matter filed on April 23, 2018, the trial court accepted Risoldi's adoption of her co-defendant's motion. As a result, we decline to find waiver.

**A.**

Under Rule 600, a case must be called to trial or a plea must be tendered within 365 days from the date on which the criminal complaint was filed. Pa.R.Crim.P. 600(A)(2)(a). When computing the time that has elapsed, "periods of delay caused by the defendant," also known as excludable time, are excluded from the length of time that has elapsed from when the complaint was filed. Pa.R.Crim.P. 600(C)(2). When a continuance is granted, the subsequent order should "record to which party the period of delay caused by the continuance shall be attributed, and whether the time will be included in or excluded from the computation of the time within which trial must commence in accordance with this rule." Pa.R.Crim.P. 600(C)(3)(a)(ii).

Excusable time, or periods of Commonwealth delay during which the Commonwealth exercised due diligence, is also added to the mechanical run date to calculate the adjusted run date. ***Commonwealth v. Moore***, 214 A.3d 244, 248-49 (Pa. Super. 2019); Pa.R.Crim.P. 600(C)(1). "Due diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth." ***Moore, supra*** (citation omitted).

When reviewing a Rule 600 claim, we first calculate the mechanical run date, which is 365 days from the date the complaint was filed. ***Id.*** We then add the excludable and excusable time to the mechanical run date to calculate

the adjusted run date. ***Id.*** If the defendant does not enter a plea or begin trial by the adjusted run date, he may file a written motion seeking dismissal of all charges with prejudice. Pa.R.Crim.P. 600(D)(1). Finally, we must remain mindful of the dual purposes served by the rule:

> Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

***Commonwealth v. Martz***, ___ A.3d ___, at *5 (Pa. Super. April 28, 2020) (citations omitted).

Here, a criminal complaint was filed against Risoldi on January 22, 2015. As a result, the mechanical run date was January 22, 2016. Pa.R.Crim.P. 600(A)(2). Risoldi's trial began on January 14, 2019; however, based on her counsel's schedule, she explicitly waived her Rule 600 rights for the period between January 26, 2018, and January 14, 2019. R.R. at 56a-58a. Therefore, 1,100 days elapsed between January 22, 2015, the date the charges were filed, and January 26, 2018, when she waived any further Rule 600 claim. She argues that notwithstanding that waiver, 365 days of non-excludable or excusable time had already elapsed by January 26, 2018. Thus, her waiver after January 2018 did not excuse the Commonwealth's failure to bring her to trial before that date if it did not exercise due diligence during

that time. ***See Commonwealth v. Barbour***, 189 A.3d 944, 959 (Pa. 2018) (holding that periods of delay caused by a defendant after the expiration of the Rule 600 time period are irrelevant to the computation of delay).

With these principles in mind, we turn to the merits of Risoldi's claim.[16]

**B.**

First, we address the period of delay following the Commonwealth's filing of its motion to bypass the preliminary hearing. On February 4, 2015, the Commonwealth filed a Petition to File Bills of Information Without a Preliminary Hearing. Risoldi filed her objections to the petition on February 18, 2015, and the trial court denied the petition on March 3, 2015. The preliminary hearing, which lasted seven days, subsequently took place and all charges were held for court on March 30, 2015. Risoldi argues that 49 days

---

[16] We note that Carl's Rule 600 motion, adopted without additions or amendments by Risoldi, does not set forth any additional periods of delay separate from the two identified ***supra***. Further, in her brief on appeal, Risoldi does not set forth a full timeline of the case, including any excludable time caused by continuances requested by the defense. Our review of the trial court docket reveals multiple pre-trial motions filed by Risoldi and the Commonwealth that may have resulted in periods of excludable or excusable time; however, we are unable to determine on the record before us the effect these motions had on the timeline of the case. ***See, e.g.***, Risoldi's Petition for Write of Habeas Corpus and Memorandum of Law, 6/15/15; Risoldi's Motion for Continuance of Trial, 1/8/16; and Commonwealth's Motion to Hold Defendant in Contempt of Court, 6/1/16. The two periods of time that Risoldi challenges constitute 697 days of the 1,100 that passed between the filing of the charges and her Rule 600 waiver. As Risoldi has not addressed whether any additional periods of delay were excludable or excusable, any argument regarding these remaining periods of time is waived.

should be included in the Rule 600 computation as delay caused by the Commonwealth without due diligence, as the motion was devoid of any support in the law. **See** Risoldi's Brief at 38-40.

In its response to the Motion to Dismiss Pursuant to Rule 600, the Commonwealth attached a letter from all defense counsel dated January 27, 2015. **See** Commonwealth's Response to Motion to Dismiss Under Rule 600, 3/6/18, Exhibit A. In the letter, all co-defendants, including Risoldi, requested that the preliminary hearing be scheduled no earlier than March 10, 2015, as that was the earliest date on which all counsel would be available. **Id.** Because the Commonwealth's motion to bypass the preliminary hearing was filed and denied prior to the earliest date on which the preliminary hearing could have been held, the motion did not cause any delay in the proceedings. To the contrary, the preliminary hearing, which was originally scheduled for February 9, 2015, was continued based on the unavailability of the defendants before the Commonwealth filed its motion. As such, this period is excludable as delay caused by the defendants.

### C.

Next, Risoldi argues that 648 days of non-excusable delay occurred when the Commonwealth motioned for the trial court's recusal and appealed from the denial of that motion. Again, Risoldi argues that the recusal motion and subsequent appeal were entirely frivolous, such that the time attributed to those proceedings cannot be excusable delay under Rule 600.

As acknowledged by Risoldi, the case most directly on point addressing the effect of a Commonwealth appeal on a Rule 600 motion is *Commonwealth v. Matis*, 710 A.2d 12 (Pa. 1998).[17] There, the Commonwealth sought a continuance of a trial date, averring that it had been unable to subpoena an essential witness for trial and would be unable to prove the elements of its case without her. *Id.* at 14. The trial court denied the motion and the Commonwealth filed a notice of appeal on the day of trial, certifying that the trial court's denial had substantially impaired the prosecution. *Id.* at 15. Ultimately, this court quashed the appeal and denied the Commonwealth's motion for reconsideration. *Id.* When the case was remanded to the trial court, the defendant filed a Rule 600 motion alleging that the Commonwealth "failed to exercise due diligence in bringing him to trial and filed a frivolous appeal in bad faith from a non-appealable interlocutory order for the sole purpose of delaying the trial." *Id.*

The trial court granted the motion, finding that while the Commonwealth had not acted in bad faith, it did not exercise due diligence in bringing the

_____

[17] We note that Rule 600 was formerly numbered as Rule 1100 and was amended and renumbered on April 1, 2001. "However, because much of the rule's substance remained consistent throughout the amendment, [Pennsylvania courts have] continued to apply our precedents interpreting former Rule 1100 to the analogous provisions of Rule 600, sometimes employing Rule 600 nomenclature to facilitate discussion of Rule 1100 precedents." *Commonwealth v. Barbour*, 189 A.3d 944, 946 n.1 (Pa. 2018). For consistency, we refer to Rule 600 in our discussion of earlier precedents.

defendant to trial. *Id.* The Commonwealth appealed and this court reversed. *Id.* On further review, our Supreme Court held that "[i]f the Commonwealth files a pre-trial appeal in bad faith without the right to do so, it fails to exercise due diligence pursuant to [Rule 600]." *Id.* at 17 (citation omitted). However, the Court further recognized that "a pre-trial appeal by the Commonwealth can serve as a proper basis to extend the period for commencement of trial pursuant to [Rule 600]," such as when the Commonwealth certifies that a trial court's suppression order has substantially handicapped the prosecution. *Id.* at 17-18 (citing *Jones v. Commonwealth*, 434 A.2d 1197 (Pa. 1981)). The court noted that such a certification is sufficient to protect against the filing of frivolous interlocutory appeals. *Id.* at 18.

Thus, notwithstanding the fact that this court had quashed the Commonwealth's interlocutory appeal, the Supreme Court in *Matis* held that the time period during which the interlocutory appeal had been pending was excusable delay during which the Commonwealth had exercised due diligence. *Id.* at 19. Moreover, since the trial court had found that the Commonwealth did not act in bad faith in filing the appeal, it was a valid interlocutory appeal. *Id.* Because the Commonwealth exercised due diligence in certifying the interlocutory appeal, the Supreme Court affirmed this court's reversal of the order discharging the defendant. *Id.*; *compare Commonwealth v. Malinowski*, 671 A.2d 674, 679-80 (Pa. 1996) (holding that the Commonwealth failed to exercise due diligence in filing an interlocutory appeal

when it did not certify that the suppression order substantially handicapped the prosecution, rendering the order unappealable).

*Matis* is consistent with prior holdings of this court that the Commonwealth's good-faith interlocutory appeal constituted excusable delay under Rule 600, even if the Commonwealth was unsuccessful on the merits of its claim. *See, e.g.*, *Commonwealth v. Ferri*, 599 A.2d 208, 210 (Pa. Super. 1991) (holding that four-year delay for Commonwealth's appeal of a denied motion for severance did not violate Rule 600); *Commonwealth v. Coleman*, 491 A.2d 200, 202 (Pa. Super. 1985) (holding that Commonwealth's interlocutory appeal did not violate Rule 600 when the Commonwealth had a right to appeal that would be moot after trial and there was no evidence that the Commonwealth took the appeal as a delay tactic). Thus, the Commonwealth need not be successful in its interlocutory appeal to establish due diligence for the purposes of Rule 600.

The Commonwealth is entitled to a pre-trial appeal in some circumstances in a criminal case. *See* Pa.R.A.P. 311(d) (Interlocutory Appeals as of Right); Pa.R.A.P. 313 (Collateral Orders).[18] Given the length of the

_____

[18] Risoldi devotes much her of argument to whether this court properly exercised jurisdiction over *Risoldi I* as an interlocutory appeal. *See* Risoldi's Brief at 41-45. In *Risoldi I*, this court noted that the Commonwealth had complied with Pa.R.A.P. 311(d) by certifying that the denial of the recusal order substantially handicapped the prosecution. *Risoldi I*, *supra*, at *2 n.9. In addition, this court has jurisdiction over a Commonwealth appeal from an

appellate process, this right would be largely illusory if the Commonwealth could not exercise it without certainty that it would succeed on the merits. This court has previously recognized that the Commonwealth may appeal an order denying its recusal motion pursuant to Pa.R.A.P. 313. ***Commonwealth v. Stevenson***, 829 A.2d 701, 704 (Pa. Super. 2003). In ***Stevenson***, we emphasized that double jeopardy protections preclude the Commonwealth from challenging the denial of a recusal motion if it loses its case, while a defendant who wishes to challenge the denial of a recusal motion retains the right to post-sentencing appellate review. ***Id.*** An appeal pursuant to Pa.R.A.P. 313 protects the Commonwealth's interest in a trial free from bias, prejudice, unfairness or the appearance thereof.

Under all of these circumstances, the Commonwealth in this case was entitled to appeal from the trial court's order denying its motion to recuse, regardless of the fact that this court ultimately affirmed the trial court's order. There is no indication in the record that the Commonwealth took the appeal in bad faith or as a means to delay trial. ***Matis***, ***supra.*** Even though the Commonwealth was unsuccessful on appeal, it had a legitimate interest in ensuring the fairness and impartiality of the trial court and it was entitled to protect that interest through appellate review. As such, the Commonwealth

---

order denying recusal pursuant to Pa.R.A.P. 313. ***Commonwealth v. Stevenson***, 829 A.2d 701, 704 (Pa. Super. 2003).

exercised due diligence and the period during which the motion to recuse and subsequent appeal were litigated is excusable delay under Pa.R.Crim.P. 600(C)(1). As neither of the periods of delay challenged by Risoldi result in a violation of Rule 600, the trial court did not abuse its discretion in denying the motion to dismiss.

## III.

Next, we turn to Risoldi's challenges to the sufficiency of the evidence.[19] Risoldi argues that the evidence was insufficient to support her convictions for insurance fraud and theft by deception related to the drapes claim, and her convictions for insurance fraud and criminal attempt—theft by deception related to the jewelry claim.[20] We find the evidence insufficient to support her

---

[19] Risoldi's sufficiency claims are unique because of the special interrogatories the jury answered when it found her guilty of insurance fraud and theft by deception. Risoldi challenges the sufficiency of the evidence only as to the claims related to the drapes and the jewelry. As noted **supra**, the jury specified the fraudulent conduct that supported the convictions for insurance fraud and theft by deception. For count 2, insurance fraud, the jury found that Risoldi engaged in fraud as to the drapery claim, the mural claim and the ALE claim. At count 4, theft by deception, the jury found that Risoldi engaged in theft as to the drapery claim and the ALE claim. Risoldi does not challenge the sufficiency of the evidence at counts 2 or 4 related to the ALE or the mural. Therefore, she would not be entitled to have the convictions at count 2 and count 4 vacated regardless of our disposition on the merits of her sufficiency claim as to the drapes.

[20] Our standard of review is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence

theft by deception claim related to the drapes, but affirm the convictions in all other respects.

A person commits the crime of insurance fraud if he or she "[k]nowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim." 18 Pa.C.S. § 4117(a)(2). The statute further defines a "statement" as "[a]ny oral or written presentation of other evidence of loss, injury or expense, including, but not limited to . . . receipt for payment, invoice, account, estimate of property damages. . ." 18 Pa.C.S. § 4117(l).

A person commits the crime of theft by deception if he or she "intentionally obtains or withholds property of another by deception." 18 Pa.C.S. § 3922(a). "A person deceives if he intentionally: creates or reinforces

_____

to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

***Commonwealth v. Lopez***, 57 A.3d 74, 79 (Pa. Super. 2012) (citation omitted).

a false impression, including false impressions as to law, value, intention or other state of mind." 18 Pa.C.S. § 3922(a)(1). Additionally, a person commits the crime of criminal attempt if, "with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a).

We note that "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Gause**, 164 A.3d 532, 541 (Pa. Super. 2017) (citation omitted). "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." **Id.** "Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law." **Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000). On appeal, this court evaluates the full record to determine whether sufficiency evidence was presented to support each element of the crime charged; however, we do not second-guess the jury's factual determinations.

**A.**

We first address the sufficiency of the evidence to sustain the convictions for insurance fraud and theft by deception related to the drapes. Risoldi argues that the Commonwealth's case was fatally flawed because it did not call a witness from Summerdale to testify regarding Risoldi's purchases.

- 39 -

*See* Risoldi's Brief at 76-77. She contends that a Summerdale employee was an essential witness without whom the jury could not conclude, beyond a reasonable doubt, that she did not spend $1.2 million on drapes after the 2010 fire.

In contravention of our well-settled standard of review, Risoldi's argument views the evidence in the light most favorable to her. Risoldi presented evidence to the jury regarding the receipts Carl recovered from the warehouse where her belongings were stored, as well as testimony by an employee from Summerdale who described the complexity and cost of the work he performed at Clairemont. Risoldi also vigorously cross-examined the Commonwealth's witnesses regarding the receipts that were recovered directly from Summerdale and whether these documents represented all of Risoldi's purchases over the year. Much of Risoldi's cross-examination and closing argument focused on Summerdale's organizational system, arguing to the jury that the OAG had not performed an adequate search of all the paperwork at Summerdale to ensure that it collected everything related to Clairemont. However, the jury rejected these arguments. On review, we accept the jury's factual and credibility determinations.

Even without testimony from an employee of Summerdale, the Commonwealth presented sufficient evidence for the jury to conclude that Risoldi did not spend $1.2 million on drapes at Summerdale. Special Agent Gomez, who executed a search warrant at Summerdale and seized all

documents related to Risoldi and Clairemont from its premises, testified that the receipts he recovered directly from Summerdale differed in many respects from the receipts Risoldi submitted to AIG. In addition to misspelling "Summerdale," Risoldi's receipts did not contain order numbers, order dates, installation information, transaction numbers or the name of the salesperson. These receipts clearly fell within the definition of a "statement" under the insurance fraud statute, 18 Pa.C.S. § 4117(l), and Risoldi submitted these fabricated receipts intentionally in support of her claim to entice AIG into paying her $2.3 million to replace her drapes.[21] Viewing the evidence in the light most favorable to the Commonwealth, the jury could have concluded that the receipts Risoldi submitted from "Summerdal" in support of her verified proof of loss were not legitimate.

In addition, the receipts that Special Agent Gomez seized directly from Summerdale did not substantiate Risoldi's claim that she had spent over a million dollars on drapery at any point in time. While one estimate from

---

[21] We reject Risoldi's argument that submitting fabricated receipts would not constitute insurance fraud if the receipts were created by Risoldi after the fact to document a transaction that had previously occurred. *See* Risoldi's Brief at 77, n.32. The insurance fraud statute criminalizes submitting any "statement" containing "false, incomplete or misleading information concerning any fact or thing material to the claim." 18 Pa.C.S. § 4117(a)(2). A fabricated receipt created by a consumer and presented as an official document from a retailer, without the retailer's knowledge, constitutes false or misleading information under this definition, and certainly would be material to the insurance claim.

Summerdale indicated that the cost to replace the drapes following the 2010 fire would be $1.2 million, there was no paperwork verifying that Risoldi followed through with that estimate and actually replaced her drapes for that price. As the trial court noted in its opinion:

> Common sense[] suggests that there would be a paper or electronic trail in a business transaction where 1.2 million dollars changed hands. Common sense suggests that a business would spell its name CONSISTENTLY and CORRECTLY in its dealings with customers. Common sense suggests a business would retain its records and be able to produce them when requested. Common sense suggests that when the OAG and AIG looked in all the places where such records should exist and did not find them, that they didn't exist. Defendant's explanation that all her records were destroyed in the fire could have been viewed by the jury as too convenient an explanation and therefore not credible.

Trial Court Opinion, 7/23/19, at 10-11 (footnote omitted). We agree. The jury was entitled to conclude that the receipts recovered from Summerdale were the only legitimate receipts from Risoldi's transactions with the company, and that the receipts she submitted in support of her claim were fabricated.

Finally, the OAG's forensic accountant testified that her review of the Risoldis' finances from 2009 through 2018 revealed only approximately $191,000 in spending on draperies and fabrics, even though this period encompassed all three of the fires at Clairemont. Again, even though Risoldi presented evidence that she had substantial stores of cash that she could have used to purchase the drapes, the jury was entitled to credit the Commonwealth's evidence and find that she had spent far less than she represented to AIG on drapes over the years. In total, this evidence is

sufficient for the jury to conclude that Risoldi intentionally submitted false information in support of her insurance claim under the statute. 18 Pa.C.S. § 4117(a)(2).

However, the evidence was insufficient for the jury to conclude that Risoldi actually obtained payments on her homeowners' insurance claim through deception, in violation of the theft by deception statute, when she submitted fabricated receipts in support of her claim. 18 Pa.C.S. § 3922(a). As Risoldi points out, she was paid approximately $7.5 million for the structural damage to Clairemont, $2 million for damage to the contents and $1 million for ALE. R.R. at 170a-71a. The Commonwealth did not present any evidence regarding whether the money paid for the contents of Clairemont encompassed any payments in reimbursement for the drapes. Further, in his testimony regarding the drapes claim, O'Keefe indicated that Risoldi requested $2.3 million for the drapes, but did not state that AIG made any payments on this amount. To the contrary, the proof of loss documents Risoldi submitted to AIG, including the fabricated receipts from Summerdale, were submitted after AIG made its initial payments and requested additional funds to what had already been paid.

While Risoldi could have appropriately been charged with criminal attempt—theft by deception for the drapes claim, the evidence is insufficient to establish, beyond a reasonable doubt, that she actually obtained or withheld AIG's property by deception under the statute. 18 Pa.C.S. § 3922(a). As

noted *supra*, the jury's verdict on a single count of theft by deception encompassed the claims for the drapes and the ALE. Risoldi did not challenge the sufficiency of the evidence to sustain her theft by deception conviction regarding the ALE, and, as such, we do not disturb her conviction on that count. Nevertheless, our disposition as to the drapes claim impacts our analysis of her challenge to the restitution set by the trial court and will be discussed in more detail *infra*.

**B.**

Next, Risoldi argues that the evidence was insufficient to support her convictions for insurance fraud and criminal attempt—theft by deception for the insurance claim she filed under the collections policy seeking reimbursement for $10 million worth of jewelry she alleged had been stolen from Clairemont during the fire. Risoldi argues that the OAG failed to prove that she had not left the jewelry on the chair in the foyer where it was stolen during the firefighting efforts. She contends that if this statement was not false beyond a reasonable doubt, then her convictions related to the jewelry claim cannot be sustained.

This argument misconstrues the claim. There is no doubt that Risoldi owned a significant amount of jewelry; indeed, the OAG seized hundreds of pieces from the Risoldi family for inspection by its expert. However, the insurance fraud and criminal attempt—theft by deception charges were based on Risoldi's claims that she lost jewelry valued at $10 million during the fire.

The Commonwealth presented evidence that Risoldi did not own $10 million worth of jewelry, and that the pieces that were missing had, in fact, been reported stolen in prior insurance claims. In her EUO in support of her jewelry claim following the 2013 fire, Risoldi claimed that the stolen jewelry included gifts from her late husband. This statement directly contradicted her EUOs for her earlier insurance claims in which she stated that all of her jewelry was stolen, including the gifts from her husband and other priceless heirlooms.

In addition, in her verified proof of loss, Risoldi claimed that a diamond engagement ring purchased at Lauria Jewelers had gone missing after the fire. Agent Gray's search of Lauria Jewelers did not uncover any receipts for such a ring. Thus, the jury could have concluded that Risoldi submitted a false insurance claim for a diamond ring that she did not own. Additionally, when adding jewelry to the collections policy, Risoldi had submitted multiple appraisals that were purportedly conducted by Lauria Jewelers. In contrast to the appraisals seized directly from Lauria Jewelers, the appraisal forms submitted by Risoldi misspelled "jewelry" as "jewelery," and the search of Lauria Jewelers only turned up a single appraisal conducted for Risoldi. One of the appraisals from Lauria Jewelers that Risoldi submitted to AIG had allegedly been completed in April 2013. However, all of the jewelry had been stored in the Risoldis' safe deposit boxes and bank records revealed that no one had accessed the boxes in April 2013.

The Commonwealth presented additional evidence that Risoldi had submitted fraudulent appraisals for jewelry to AIG. After searching Risoldi's home, Special Agent Gomez recovered several blank appraisal forms that had been altered and photocopied. He recovered forms from Fairless Hills with Risoldi's name on them, and photocopies of those appraisals that included the appraiser's signature but were otherwise blank. He found another form with the word "appraisal" glued to the bottom, and photocopies of the form made it appear as if "appraisal" was printed on the form. On another form, the signature at the bottom had been cut off. Pictures of pieces of jewelry that had been cut out from another source were located with the forms, and some appraisals had areas that had been covered with whiteout. The blank and doctored appraisal forms and the Lauria Jewelry appraisals initially submitted by Risoldi when she sought to add pieces to her collections policy were strong circumstantial evidence that Risoldi had sought insurance coverage for expensive pieces of jewelry that did not actually exist and later filed a claim for these pieces.

The jury was also entitled to consider the circumstantial evidence of Risoldi's behavior immediately following the fire, when she delayed for nearly two months before reporting the alleged theft to the authorities. Sergeant Landis testified that Risoldi did not mention the jewelry at the scene of the fire, and that if she had, he would have gone into Clairemont to retrieve it. Additionally, Sergeant Landis and O'Keefe both spoke with Risoldi multiple

times following the fire about the allegedly missing jewelry and repeatedly advised her to report the theft to the local police. Despite the fact that she was allegedly the victim of a $10 million theft, Risoldi delayed in filing a police report and initiating an insurance claim. The jury could conclude that this behavior was evidence that Risoldi had not, in fact, suffered that substantial loss.

Finally, the forensic accountant testified that Risoldi did not spend $10 million on jewelry during the period she investigated, nor could she afford to. As Risoldi had claimed that all her jewelry had been stolen in her previous insurance claims, the jury could conclude that Risoldi did not have the means to replace $10 million worth of jewelry, but had instead submitted a fraudulent claim for expensive pieces that she did not own. Under the totality of the circumstances and viewing the evidence in the light most favorable to the Commonwealth, the evidence was sufficient for the jury to conclude that Risoldi made multiple false statements in support of a fraudulent insurance claim, attempting to recover for jewelry she either did not own or which was not worth the $10 million. These facts are sufficient to support her convictions for insurance fraud and criminal attempt—theft by deception, and this issue merits no relief.

## IV.

Next, Risoldi contends that the trial court abused its discretion by denying her motion for a mistrial after the Commonwealth, when cross-

examining a defense witness from Summerdale, improperly shifted the burden of proof by asking whether any witnesses from Summerdale were going to testify regarding billing or invoices.[22]  Risoldi argues that she was prejudiced because the question suggested to the jury that she had deliberately failed to call such a witness in order to conceal her own wrongdoing.  She argues that a bookkeeper from Summerdale could have provided central testimony in support of the Commonwealth's argument that Summerdale did not have records documenting $1.2 million in purchases after the 2010 fire, and only the Commonwealth had the burden of calling such a witness.  She requests relief in the form of a new trial, arguing that the question was not only improper, but also so prejudicial as to prevent the jury from rendering a fair and impartial verdict.  We disagree.

> Initially, we note that
>
> the remedy of a mistrial is an extreme one. . . .  It is primarily within the trial court's discretion to determine whether Appellant was prejudiced by the event that forms the substance of the motion.  Finally, it must be remembered that a mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial.

**Commonwealth v. Lease**, 703 A.2d 506, 508 (Pa. Super. 1997) (citations omitted).  Thus, a mistrial is an extreme remedy only warranted when the

---

[22] "The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion."  **Commonwealth v. Simpson**, 754 A.2d 1264, 1272 (Pa. 2000) (citation omitted).

prejudice to the movant cannot be ameliorated to ensure a fair trial. "A mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice." **Commonwealth v. Cash**, 7137 A.3d 1262, 1273 (Pa. 2016) (citation omitted). Finally, juries are presumed to follow the trial court's cautionary instructions. **Commonwealth v. Fletcher**, 41 A.3d 892, 896 (Pa. Super. 2012) (holding that a mistrial was properly denied when, during a two-day jury trial with multiple eyewitnesses, the Commonwealth asked an improper question on cross-examination and a cautionary instruction was issued).

As noted **supra**, Risoldi called Kiosewski, an installer from Summerdale, to testify that he had performed a significant amount of work with expensive drapes and fabrics at Clairemont after the 2010 fire. On cross-examination, the Commonwealth asked Kiosewski to review receipts it had seized from Summerdale and confirm whether they totaled over $1 million worth of drapes and labor. Risoldi objected to this line of questioning on the basis that Kiosewski did not work in billing at Summerdale, and the trial court allowed Kiosewski to confirm that the receipts appeared genuine and reflected specific amount of billing. Following this discussion, the Commonwealth asked Kiosewski the following question: "Those who handle the money at Summerdale, do you know if they're coming in to testify?" **Id.** at 2305a.

Kiosewski did not answer the question, as Risoldi immediately objected and requested a mistrial, arguing that the Commonwealth had improperly

suggested that the defense had an obligation to call a witness from Summerdale to testify regarding financial matters. The Commonwealth argued that the defense had opened the door by objecting on the basis that Kiosewski did not work in billing for Summerdale. The trial court denied the motion for a mistrial, finding that while the question was improper, it was not asked with the intent of depriving Risoldi of a fair trial and did not have that effect. *Id.* at 2313a-14a.

> The trial court issued the following cautionary instruction to the jury:

> I remind you that the defendant has absolutely no obligation to call any witness, let alone a particular witness. The defendant has no burden to disprove the Commonwealth's case. Rather, the Commonwealth has the unshifting burden of proof to prove its case and each element of its case beyond a reasonable doubt by presenting whatever evidence the Commonwealth wishes to do and by calling whatever witnesses the Commonwealth wishes to call.

> The defendant has absolutely no obligation to call any witness whatsoever. The fact that the defendant calls a particular witness, that's the defendant's choice. Once the witness is up here, they can be asked relevant questions. But the suggestion that they have to call any particular witness or any witnesses whatsoever is absolutely improper.

*Id.* at 2325a-26a. In addition, in both its opening charge and its final charge to the jury, the trial court reiterated that the Commonwealth bore the burden of proving each element of the crimes charged beyond a reasonable doubt, and that Risoldi had no obligation to present any evidence refuting the charges. *Id.* at 97a-99a; 3068a-71a.

The trial court provided the following reasoning in support of its decision to deny a mistrial:

> Having dealt with [the prosecutor] over the course of many months, I had/have no hesitation in concluding that this was an error on her part, not an attempt to shift the burden of proof to the defense. Not every error warrants the draconian response of a mistrial. In framing my response, I was well aware of the case law governing mistrials having had to address same many times previously. Like obscenity, one instinctively knows what conduct warrants a mistrial.
>
> [The prosecutor] was engaging, in my view, in an unfortunate "tit for tat" response to [the defense's] questions and certainly was not seeking to provoke him into requesting a mistrial. We were in our twelfth day of testimony and there had been the expected number of clashes between counsel, as well as the expected "pushing the envelope" type exchanges. However, I do not believe her question was asked to prejudice [Risoldi] to the point of denying her a fair trial and/or to suggest that she had any burden of proof whatsoever. This question and conduct is at the opposite extreme from that in [**Commonwealth v. Smith**], 615 A.2d 321 (Pa. 1992) and [**Commonwealth v. Martorano**], 741 [A].2d 1221 (Pa. 1991) where mistrials were warranted. I also considered that I had addressed the jury as to the burden of proof in my opening and would do so again in my closing. I considered that this was a single instance, not something that had been ongoing and pervasive throughout the trial. Accordingly, I believed a curative instruction was the appropriate relief. As such, a mistrial was not warranted and [Risoldi] is not entitled to relief on this ground.

Trial Court Opinion, 7/23/19, at 120-21. We agree.

There is no indication in the record that the Commonwealth asked Kiosewski this question with the intent to provoke a mistrial or deprive Risoldi of a fair trial. Within the scope of a three-week trial, this single question, while improper, was not so prejudicial as to have the unavoidable effect of depriving Risoldi of a fair trial. Risoldi immediately objected to the question

before Kiosewski answered, and the trial court issued a cautionary instruction that was drafted in large part by the defense. This instruction, coupled with the instructions given at the beginning of the trial and in the final charge, was sufficient to allay any prejudice that may have arose from the question and we discern no abuse of discretion by the trial court. **See Fletcher**, **supra**. As such, this issue is meritless.

**V.**

Finally, Risoldi challenges the legality of the restitution portion of her sentence.[23] The trial court ordered Risoldi to pay restitution to AIG of $10,428,428.13, which was the full amount that AIG paid to Risoldi pursuant to her homeowners' insurance policy following the 2013 fire. Risoldi argues that because not all of her insurance claims were fraudulent, the trial court was not empowered to sentence her to pay restitution in the full amount of the money she received because of the non-fraudulent claims. We agree.

_____

[23] A challenge to the trial court's authority to impose a sentence of restitution based on its finding that the restitution was a direct result of the criminal conduct is a challenge to the legality of the sentence. **See Commonwealth v. Oree**, 911 A.2d 169, 173 (Pa. Super. 2006). Therefore, our standard of review is de novo and our scope of review is plenary. **Commonwealth v. Stradley**, 50 A.3d 769, 772 (Pa. Super. 2012).

- 52 -

**A.**

Restitution is a mandatory component of the sentence[24] for any crime in which a victim's property is "stolen, converted or otherwise unlawfully obtained." 18 Pa.C.S. § 1106(a)(1); **see also** 42 Pa.C.S. § 9721(c). "In determining the amount and method of restitution, the court: [s]hall consider the extent of the injury suffered by the victim." 18 Pa.C.S. § 1106(c)(2)(i). However, a restitution order in a criminal case does not bar the victim from further recovery from the defendant in a civil action.[25] 18 Pa.C.S. § 1106(g) ("No judgment or order of restitution shall debar the victim, by appropriate action, to recover from the offender as otherwise provided by law, provided

---

[24] This is distinct from when restitution is imposed as a condition of probation pursuant to 42 Pa.C.S. § 9754. As discussed **infra**, when restitution is imposed as part of a sentence, there must be a direct nexus between the criminal conduct and the loss suffered by the victim. **See Commonwealth v. Popow**, 844 A.2d 13, 19 (Pa. Super. 2004). In contrast, when a trial court imposes restitution as a condition of probation, "the required nexus is relaxed" and the court "is accorded latitude in fashioning probationary conditions designed to rehabilitate the defendant and to provide some measure of redress to the victim." **Id.** Here, it appears the trial court imposed restitution as part of the sentence pursuant to the mandatory restitution statute, as Risoldi was convicted of theft offenses. 18 Pa.C.S. § 1106(a); **see also** Trial Court Opinion, 7/23/19, at 5 (citing 42 Pa.C.S. § 9721(c)). We express no opinion on whether the restitution award would be appropriate as a condition of probation.

[25] We note that the insurance fraud statute provides insurers with a civil cause of action to recover damages incurred because of insurance fraud. 18 Pa.C.S. § 4117(g).

that any civil award shall be reduced by the amount paid under the criminal judgment.").

When determining the amount of restitution to be imposed as part of a defendant's sentence, the trial court must look to the losses the victim would not have suffered but for the defendant's criminal conduct.

> Because of the statutory language "directly resulting from the crime," restitution under § 1106(a) is proper only if there is a direct causal connection between the crime and the loss. . . . Thus, the sentencing court is statutorily required to impose restitution under § 1106(a) when the Commonwealth has established that the defendant committed a crime, the victim suffered injury to person or property, and there exists a direct causal nexus between the crime of which defendant was convicted and the loss or damage suffered by the victim.

*Commonwealth v. Weir*, 201 A.3d 163, 170 (Pa. Super. 2018) (citations omitted), *appeal granted*, 215 A.3d 966 (Pa. 2019). The amount of restitution must be determined "under the adversarial system with considerations of due process." *Id.* at 171.

When imposing restitution as part of a sentence, there must be a direct nexus between the restitution ordered and the crime for which the defendant was convicted. *Commonwealth v. Zrncic*, 167 A.3d 149, 152-53 (Pa. Super. 2017). The trial court may not impose restitution if the victim's loss "did not flow from the behavior for which the [defendant] was held criminally accountable." *Id.* at 153 (citation omitted). Thus, in *Zrncic*, this court held that the defendant could not be sentenced to pay restitution for the cost of replacing the victim's laptop when the laptop was seized in support of the

charge of Unlawful Contact with a Minor. As that charge was withdrawn in exchange for the defendant's plea to Aggravated Indecent Assault, there was no nexus between the loss of the laptop and the criminal conduct to which the defendant pled guilty. *Id.* As such, the restitution order was illegal. *Id.*

Similarly, in **Commonwealth v. Barger**, 956 A.2d 458, 465 (Pa. Super. 2008) (*en banc*), this court held that defendant could not be sentenced to pay for the replacement of the victim's couch when the jury acquitted him of criminal conduct related to the couch. After the jury acquitted him of the sexual offenses that were alleged to have occurred on the couch, the trial court found the defendant guilty of a summary offense of harassment for slapping the victim during the incident in question. Even though the harassment charge arose out of the same course of criminal conduct as the charges for which he was acquitted, this court held that there was no direct nexus between the harassment and the restitution for the victim's couch. *Id.* Because the defendant could not be sentenced to pay restitution related to conduct for which he was acquitted, the sentence was illegal. *Id.*

The parties direct us to **Commonwealth v. Oree**, 911 A.2d 169 (Pa. Super. 2006), and **Commonwealth v. Poplawski**, 158 A.3d 671 (Pa. Super. 2017), for interpretation of the but-for test for setting criminal restitution. In **Oree**, the defendant was convicted of simple assault and recklessly endangering another person and acquitted of aggravated assault. **Oree**, **supra**, at 172. The trial court sentenced the defendant to pay restitution

amounting to the victim's lifetime projected care expenses, as the defendant's assault on the victim resulted in severe injuries that prevented the victim from living independently. *Id.* at 171. This court held that the restitution order was not illegal as the victim's extensive injuries flowed directly from the conduct for which the defendant was convicted, even though the defendant was acquitted of the more serious charge of aggravated assault. *Id.* at 174.

In *Poplawski*, the defendant was convicted of home improvement fraud but acquitted of theft by deception and deceptive or fraudulent business practices. *Poplawski*, *supra*, at 672. The jury specifically found that the victim paid the defendant $2,000 or less. The victim testified that he paid another contractor approximately $41,000 to complete the remaining work, but it was unclear whether this sum represented the amount it would have cost to complete the project initially or whether it included more extensive work as a result of the defendant's involvement. *Id.* at 674-75. We concluded that the jury had heard the testimony regarding the cost of continuing the project following the defendant's fraud, but it specifically acquitted him of charges related to the quality and quantity of his services. *Id.* at 675. Under those circumstances, the restitution constituted an illegal sentence because it was not a direct result of the criminal conduct as found by the jury. *Id.* Importantly, we noted that the victim was still entitled to seek redress by filing a civil lawsuit against the defendant. *Id.*

With all of these principles in mind, we turn to the merits of Risoldi's claim.

**B.**

Risoldi contends that the vast majority of the proceeds she received from AIG were in payment for rebuilding and restoration of Clairemont. The cause of the fire was accidental and the jury found her not guilty of insurance fraud related to guarantee replacement costs. She concedes that AIG is entitled to partial restitution for the ALE,[26] but argues that there was no direct link between the criminal conduct for which she was convicted and the total amount of restitution ordered to AIG. She contends that the trial court exceeded its authority in imposing restitution that covered the payments made for the damage to the structure and contents of Clairemont, as it erroneously applied civil law in a criminal proceeding to determine that her insurance contract with AIG was void. She argues that the criminal proceeding was the incorrect venue for AIG to recover based on a breach of contract

_____

[26] At trial, the Commonwealth presented evidence that Risoldi had rented a home for several months for $4,000 per month, and then purchased the home outright using a straw purchaser. After purchasing the home, she submitted a fraudulent lease to AIG representing that she was renting the home for $13,000 per month and had to pay the full rent up front for the three-year term of the lease. AIG paid her the full amount that she requested for this fraudulent lease. Risoldi now argues that she was entitled to $4,000 per month for three years, and thus obtained an excess of $9,000 per month fraudulently. She argues that AIG is only entitled to this excess amount in restitution, which totals $324,000. **_See_** Risoldi's Brief at 67-68.

theory, and that AIG was obligated to file a civil suit to recover any funds that it paid out for conduct the jury determined was not fraudulent.

In contrast, the Commonwealth argues that the homeowners' insurance policy contained a provision stating that the entire policy would be void if the insured intentionally concealed or misrepresented any material fact, engaged in fraudulent conduct, or made false representations. R.R. at 3209a. The Commonwealth further argues that Risoldi submitted fraudulent claims to AIG before AIG made payments for the undisputed damage to Clairemont. Thus, if AIG had known about the fraud at the time that it occurred, the policy would have been void in its entirety and AIG would not have made these payments. The Commonwealth argues that because the jury found that Risoldi had committed insurance fraud with regard to certain claims, the policy was void, and AIG is entitled to the $10,428,428.13 it would not have paid but for Risoldi's fraud and misrepresentations.

The trial court found that Risoldi's convictions for insurance fraud in her criminal trial would have *per se* satisfied any burden of proof AIG had to establish fraud if it filed a civil suit against her to recover the funds it had paid under the homeowners' policy. The trial court agreed that the fraud vitiated the insurance contract and AIG's obligation to pay for the legitimate losses at Clairemont. It concluded that but for the fraud, AIG would not have paid Risoldi for the homeowners' claims and, as a result, AIG was entitled to restitution of the full amount it had paid on those claims.

However, Risoldi was not convicted of insurance fraud related to the undisputed damage to the structure and contents of Clairemont or guaranteed replacement costs. The verdict form allowed the jury to specify the fraudulent conduct that it concluded that Risoldi had engaged in, as well as the amount of insurance proceeds Risoldi had received because of that conduct. R.R. at 3267a-68a. At count two, insurance fraud, the jury specified that the fraudulent conduct was for Risoldi's drapery claim, mural claim and ALE claim. It found that the claim related to the guaranteed rebuilding costs was not fraudulent. At count three, insurance fraud, the jury found that Risoldi's jewelry claim was fraudulent. At count 4, theft by deception, the jury found that Risoldi had committed theft related to her drapery claim and ALE claim and stated that the amount of money obtained from those claims was $2,750,000. At count five, criminal attempt—theft by deception, the jury found that Risoldi attempted to obtain $10,000,000 related to her jewelry claim. At trial, O'Keefe testified that AIG paid Risoldi approximately $7.5 million for damage to the structure of Clairemont, as well as $2 million for the contents and $1 million for ALE. R.R. at 170a-71a.

Importantly, the fact that the 2013 fire at Clairemont was accidental was not disputed. The trial court repeatedly instructed the jury that Risoldi had not been charged with arson and there was no allegation that she was responsible for the fire. At trial, O'Keefe agreed that because the cause of the fire was accidental, the homeowners' insurance policy covered the rebuilding

costs for the property, though AIG and the Risoldis disagreed as to the amount that it would cost to restore Clairemont. At the time of trial, O'Keefe believed that AIG and the Risoldis had not reached an agreement on the rebuilding costs. AIG had paid Risoldi the policy limit for the damage to the structure but that any further replacement costs were still a point of negotiation. Risoldi was not convicted of any fraud or wrongdoing specific to the structural damage to Clairemont or the guaranteed replacement costs.

Much like *Zrncic* and *Barger*, the jury in this case acquitted Risoldi of certain criminal conduct and made specific findings of fact regarding what conduct was fraudulent, in addition to finding the total loss suffered by AIG because of the fraudulent conduct. The Commonwealth attempted to prove at trial that Risoldi's claim for guaranteed rebuilding costs of Clairemont was fraudulent; however, there is no doubt that the jury rejected this argument in its verdict. The Commonwealth never attempted to prove fraud or wrongdoing related to the damage that arose because of the fire, which was not disputed that it was accidental. Nevertheless, the trial court ordered Risoldi to pay restitution that encompassed the payments AIG made to the Risoldis based on the undisputed, accidental damage to Clairemont and its contents. Based on the special interrogatories and the charges filed, there is no direct nexus between restitution for the payments on the policy limits and the criminal conduct for which Risoldi was actually convicted. As her convictions did not encompass the payments for damage to the structure and contents that

actually resulted from the fire, the trial court erred by imposing restitution that covered those costs.

Likewise, we find these circumstances distinguishable from *Oree*, relied upon by the Commonwealth. There, the defendant was convicted of simple assault but acquitted of aggravated assault, and he was sentenced to pay restitution that accounted for the victim's care and medical expenses throughout the rest of his life. *Oree*, *supra*. The direct nexus between the criminal conduct and the restitution was clear: but for the simple assault, the victim would not have sustained the injuries resulting in his need for long-term care. While the jury acquitted the defendant of the more serious aggravated assault charge, it nonetheless concluded that the defendant had engaged in conduct causing the victim's injuries. *Id.* Here, however, the jury reached the opposite conclusion as to the guaranteed replacement costs and specifically found that Risoldi had not engaged in insurance fraud as to those claims. The jury was never presented with the option of finding that Risoldi committed fraud as to the structural and contents damage at Clairemont as the Commonwealth had agreed that this damage was accidental. There was no direct nexus between the fraudulent conduct for which the jury convicted Risoldi and the payments for damage to the structure and contents of Clairemont.

The Commonwealth attempts to circumvent the jury's verdict by arguing that the insurance policy's fraud and misrepresentation provision rendered the

entire contract void when Risoldi was convicted of fraud related to other portions of her insurance claims. Similarly, in its opinion, the trial court opined that "[t]his is a situation where a victim has options for recovering its loss. It can rely on the criminal justice system to protect its interests or submit its claim to the civil courts for resolution. These options can be pursued individually and/or jointly." Trial Court Opinion, 7/23/19, at 6. While it is true that a restitution order does not preclude a victim from seeking further redress in a civil forum, *see* 18 Pa.C.S. § 1106(g), restitution in a criminal case is nonetheless cabined by the requirement that there be a direct nexus between the proven criminal conduct and the victim's loss.

Because the parties' stipulation that the fire at Clairemont was accidental, we find that AIG's payments under the insurance contract, made for the undisputed damage to the structure and contents of Clairemont, were attenuated from Risoldi's criminal conduct such that restitution for those payments constitutes an illegal sentence. Here, the Commonwealth proved the criminal conduct with regard to the drapes, mural, ALE and jewelry, but not as it related to the guaranteed replacement costs. Further, the Commonwealth did not allege any fraud or wrongdoing as to the damage to Clairemont resulting from the accidental fire. O'Keefe testified that AIG disputed the total amount of guaranteed replacement costs requested by Risoldi, but had agreed that she was entitled to, at minimum, the policy limit for the structural damage.

The insurance fraud statute provides AIG with an avenue for redress if it believes that it sustained additional damages as a result of Risoldi's crimes. *See* 18 Pa.C.S. § 4117(g); *see also Poplawski*, *supra*; *Commonwealth v. Wozniakowski*, 860 A.2d 539 (Pa. Super. 2004) ("The victim is not precluded from seeking civil damages if unsatisfied with the restitution award."). In that forum, AIG could present its arguments related to the fraud and misrepresentation provision of the policy in the context of the language of the contract as a whole, and Risoldi could present any relevant defenses to AIG's claim. However, it is not the duty of the criminal court to resolve a breach of contract claim resulting in damages that do not flow directly from the criminal conduct for which the defendant was convicted.

In light of our disposition, we must remand for resentencing only as to the restitution portion of Risoldi's sentence. As we have found the evidence insufficient to support Risoldi's conviction for theft by deception as to the drapes, the restitution award related to the theft by deception claim should not reflect reimbursement for the drapes claim. However, her conviction for theft by deception remains intact because the drapes claim was only one basis to support the count of theft by deception and the charge is supported by her proper conviction for theft by deception as to the ALE. On remand, the trial court should set a restitution amount that reflects AIG's losses for the specific insurance fraud and theft by deception charges for which Risoldi was properly convicted.

Judgment of sentence affirmed in part and vacated in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/18/2020