J-S12012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AARON THOMAS | : | |
| | : | |
| Appellant | : | |

No. 1579 EDA 2020

Appeal from the Judgment of Sentence Entered May 29, 2020
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0003860-2019

BEFORE:  LAZARUS, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED JUNE 24, 2021**

Aaron Thomas appeals from the judgment of sentence entered on May 29, 2020 by the Honorable John P. Capuzzi in the Court of Common Pleas of Delaware County, after a jury convicted him of rape of a child,[1] involuntary deviate sexual intercourse with a child,[2] sexual assault,[3] indecent assault of a

_____

[1]  18 Pa.C.S.A. § 3121(c).

[2]  18 Pa.C.S.A. § 3123(b).

[3]  18 Pa.C.S.A. § 3124.1.

person less than 13 years of age,[4] and corruption of a minor.[5]  After careful

review, we affirm on the basis of the opinion authored by Judge Capuzzi.

The trial court summarized the factual background as follows:

D.J. is presently fourteen years of age and lives in Wilmington, Delaware, where she is in eighth grade.  D.J. lives with her mother and two brothers.  D.J. has been living in Wilmington for the past three years; prior to that she lived in Chester, Delaware County. D.J.'s grandmother (S.G.) and her now ex-boyfriend (Greg), D.J.'s aunt (R.G.) and her boyfriend [Thomas], [D.J.'s] uncle and his girlfriend, as well as [D.J.'s] little cousin, reside [together] in Chester, PA.  The house [], owned by S.G., consists of three floors: the basement; the first floor which contains a kitchen, dining room and living room; and the upstairs where there are three bedrooms and one bathroom.

When D.J. lived in Chester, she would often visit her [S.G.'s house], which is where she first met [Thomas].  It was not unusual for D.J. and her two brothers to often spend the night at the house.  [Thomas] met D.J. when she was approximately eight years old; about a year later, when D.J. was nine, the abuse began and continued until D.J. was eleven.  About a week before [Thomas] began abusing D.J. he started telling her things of a sexual nature, such as, explanations about boys and girls having different parts that they enjoyed touching on each other and that sex feels good.

One evening, D.J. was downstairs on the basement couch, alone, when [Thomas] came down and started touching her under her shirt.  [Thomas] bent D.J.'s body over the arm of the couch, pulled her pants down to her ankles, and put his penis inside of her anus, which caused her pain.  As he was doing this, D.J. heard [Thomas] making a grunting noise.  When he finally stopped, [Thomas] grabbed some paper towels and walked upstairs to the kitchen.

The second time that [Thomas] abused D.J. she was in the kitchen.  Although she doesn't remember exactly what day it was, D.J. was standing in the kitchen leaning over a small counter.

_____

[4] 18 Pa.C.S.A. § 3126(a)(7).

[5] 18 Pa.C.S.A. § 6301(a)(1-2).

- 2 -

[Thomas] came into the kitchen, walked behind D.J., and lifted up her shirt, kissed the back of her neck, and pulled down her pants. From behind, [Thomas] put his penis into D.J.'s anus and then into her vagina, which was incredibly painful for her and she repeatedly told him that it hurt. [Thomas] was grunting and kept telling D.J. to moan for him. D.J. repeated how much it hurt and [Thomas] eventually stopped. Not only was it painful but the vaginal penetration scared her because her grandmother is a very religious woman and has always taught her that premarital sex is a sin. Because of that, D.J. thought that she was going to be in a lot of trouble and go to hell.

On a third occasion, the abuse occurred in the living room of the home. This time, [Thomas] told D.J. to rub his penis with her hands. [Thomas] then told D.J. to get on her knees and put his penis in her mouth. [Thomas] told her she was doing it wrong and to stop biting and suck it like a popsicle. After a bit, [Thomas] told her it was enough and to stop. It wasn't painful, but it was humiliating. D.J. did discuss the abuse with [Thomas] on one occasion and asked him if he felt "a certain way" because she was so young, to which [Thomas] responded, "since you act grown up, that is how I will treat you." [Thomas] told her that if anyone ever found out, they would both be in a lot of trouble.

For approximately two years following the last incident, D.J. remained quiet and did not tell anyone for fear of getting in trouble and because she just wanted to forget about what had happened to her. However, in December of 2018, when D.J. was thirteen it became too much to bear on her own. She found herself becoming really closed off and had a hard time trusting other people; she also felt guilty for lying to her friends and family. While on the phone with her father one evening, he asked her several times if something was wrong and if she was okay; she lied and said she was fine but felt guilty for lying to him. When she hung up the phone, her mother asked her if she was okay; she said she was not but that she did not want to talk about it. After that conversation, it felt like too much of a burden to keep to herself, so, in gym class at school, she told her friends, including her best friend, M.G., what had happened. Her friends immediately told the gym teacher, Ms. Lauren Aherns, that D.J. needed to talk to her. After telling Ms. Aherns, D.J. also spoke with Officer Jones of the Chester Police Department and had a child interview with Ms. Susanne Whiting at the Child Advocacy Center of Delaware County, which was a recorded session in January of 2019.

Trial Court Opinion, 10/21/20, at 2-4 (citations and quotation marks omitted).

Following trial, the jury returned guilty verdicts on all counts. The court sentenced Thomas to an aggregate term of fourteen to twenty-eight years' imprisonment, followed by 7 years of probation. The court further ordered Thomas to comply with any psychosexual evaluations, complete the state sex offenders' program, and to comply with all recommendations. Thomas was also ordered to have no contact with the victim and to register as a Tier III sex offender under Pennsylvania's Sex Offender Registration and Notification Act (SORNA), 42 Pa.C.S.A. §§ 9799.10-9799.42.

Thomas filed this timely appeal. He raises the following issue for our review:

> Whether the trial court erred in failing to grant the defense motion for mistrial made at the conclusion of the Commonwealth's closing argument where the prosecutor argued as fact certain matters that were not in evidence, all of which was extremely prejudicial and served to deprive [] Thomas of a fair trial.

Appellant's Brief, at 7.

Our standard of review on an appeal from the denial of a motion for mistrial is limited to determining whether the trial court abused its discretion. *Commonwealth v. Chamberlain*, 30 A.3d 381 (Pa. 2011).

> [T]he remedy of a mistrial is an extreme one. It is primarily within the trial court's discretion to determine whether Appellant was prejudiced by the event that forms the substance of the motion. It must be remembered that a mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial.

*Commonwealth v. Risoldi*, 238 A.3d 434, 458 (Pa. Super. 2020) (quoting *Commonwealth v. Lease*, 703 A.2d 506, 508 (Pa. Super. 1997)).

At the conclusion of the prosecution's closing argument, Thomas made a motion for mistrial in response to remarks made by the prosecution regarding childhood trauma. Thomas argues these remarks amounted to "extra-judicial evidence since here was no testimony, expert [or] otherwise, in the record to support the claim made that [Thomas'] conduct was consistent with how a sexual predator would act or how the victim's response to the alleged assault was consistent with other similarly situated children." Appellant's Brief, at 10. He contends these remarks created bias, affecting the jury's ability to fairly weigh the credibility of the witnesses. Specifically, Thomas points to the following remarks in the prosecutor's closing argument:

> [District Attorney]: First of all, I talked to you a little bit about the reality of sexual offenses. These - especially child sexual offenses, these are done in private. It is calculated to be that way. Perpetrators rely on the fact that children are probably not going to report until maybe they're older or that they're scared to report or that they're an authority figure over them. And then lends to certain kinds of evidence. It's very frequent for children to disclose when they finally do become an age where they're able to do so, and especially if it's someone in their life who is an authority figure, like I said, over them…. I first want to go over the corroborative material of the victim's statement that you saw. First of all, the disclosure itself. She goes and she tells her friends first. This is consistent with child sexual abuse. Kids are scared of getting in trouble… Well, sex offenders aren't necessarily careful. They're impulsive. They're doing something extremely risky because they're -- they want it even though it's something that could get them in a lot of trouble… So ask yourself is this the kind of story someone would make up. First of all, she talks about grooming behavior. It was very specific things she said he talked

- 5 -

with her about, very unique things that, you know, boys like - like your parts and [girls] like my parts and sex feels good and stuff like that. And what's unique about that as well is that it – it's something apart from the actual abuse. It's something apart from like the physical abuse. And if she's lying, she wouldn't add that extra element to this. That's because she's recollecting that this actually happened, and that fits the behavior of a perpetrator of this abuse, normalizing -- normalizing a child to that kind of behavior, to that kind of incident.

*Id.* at 13-16 (quoting N.T. Jury Trial, 02/20/20, at 45-62 (internal quotation marks omitted)).

We agree with the trial court that the prosecutor's brief and inconsequential remarks regarding the trauma that child victims often suffer was common sense and an argument that could be inferred from the child's testimony. As the trial court concluded, the child explained in her testimony how the years of being raped by someone close to her family negatively impacted her social, emotional, and physical health. She admitted to feeling agony, shame, fear, and detachment from family and friends as a result of both the incident and maintaining secrecy. Both parties recognize that this case hinges on the victim's word against that of Thomas, since there was no physical evidence presented due to the amount of time that had passed since the alleged incidents. Therefore, the verdict rested on the credibility of the parties' testimony. The prosecutor's arguments were logical inferences from the testimony. Nothing was said in the prosecutor's closing argument that warranted the testimony of an expert.

Further, the court instructed the jury that they were the finders of fact and that their recollection of the facts ruled over counsel's recollection of the evidence. N.T. Jury Trial, 2/20/20, at 72-74. **See Commonwealth v. Cole**, 167 A.3d 49, 77 (Pa. Super. 2017) (jurors are presumed to follow court's instructions).

After a thorough review of the record, the parties' briefs, the applicable law, and Judge Capuzzi's detailed opinion, we agree the jury did not require an expert witness to explain that D.J. suffered in many ways as a result of the rape. We further agree that expert testimony was not required to state what is commonly understood and well known about the trauma that often results from sexual abuse. The remarks in the prosecutor's closing statements did not have an unavoidable effect of depriving Thomas of a fair and impartial trial. **Risoldi**, **supra**. The trial court properly exercised its discretion in denying the motion for mistrial. **Chamberlain**, **supra**.

We affirm on the basis of Judge Capuzzi's opinion. The parties are instructed to attach a copy of that opinion in the event of further proceedings.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/24/2021

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

**COMMONWEALTH OF PENNSYLVANIA** | CP-23-CR-3860-2019

v.

**AARON THOMAS**

A. Sheldon Kovach, Esquire, for the Commonwealth
Steven M. Papi, Esquire, for the Appellant

## OPINION

Capuzzi, J.                                                   Filed: 10/21/2020

This is an appeal from Appellant's judgment of sentence entered on May 29, 2020, wherein Appellant was sentenced to an aggregate term of fourteen to twenty-eight years as a result of his convictions for rape of a child, involuntary deviate sexual intercourse with a child, and related offenses.

On appeal, Appellant alleges that this Court erred in denying his request for a mistrial based upon remarks made during the prosecutor's closing argument. Specifically, Appellant argues that the prosecutor's refence to the child as a "victim" and not as a "complainant" was overly prejudicial, such that the jury was incapable of rending of fair and impartial verdict and that the prosecutor argued facts not in evidence during her closing. For the forthcoming reasons, this Court properly denied the motion for a mistrial, as such an extreme remedy is only required when an incident is of such a nature that its unavoidable effect is to deprive an appellant of a fair and impartial trial and neither of the alleged incidents warranted such an extreme remedy.

1

## FACTUAL BASIS

D.J., is presently fourteen years of age and lives in Wilmington, Delaware, where she in eighth grade.[1] [N.T., 2/19/2020 p. 24]. D.J., lives with her mother and two brothers. [N.T., 2/19/2020 p. 24]. D.J., has been living in Wilmington for the past three years; prior to that she lived in Chester, Delaware County. [N.T., 2/19/2020 p. 25-30]. D.J.'s grandmother (S.G.) and her now ex-boyfriend (Greg), D.J.'s aunt (R. G.) and her boyfriend (Appellant), her uncle and his girlfriend, as well as her little cousin, reside at 612 East 12th Street, in Chester, PA. [N.T., 2/19/2020 p. 26]. The house at 612 East 12th Street, owned by S.G., consists of three floors: the basement; the first floor which contains a kitchen, dining room and living room; and the upstairs where there are three bedrooms and one bathroom. [N.T., 2/19/2020 p. 35].

When D.J., lived in Chester, she would often visit her grandmother at 612 East 12th Street, which is where she first met Appellant. [N.T., 2/19/2020 p. 27]. It was not unusual for D.J., and her two brothers to often spend the night at the house. [N.T., 2/19/2020 p. 39]. Appellant met D.J., when she was approximately eight years old; about a year later, when D.J., was nine, the abuse began and continued until D.J., was eleven. [N.T., 2/19/2020 p. 29]. About a week before Appellant began abusing D.J., he started telling her things of a sexual nature, such as, explanations about boys and girls having different parts that they enjoyed touching on each other and that sex feels good. [N.T., 2/19/2020 p. 40].

One evening, D.J., was downstairs on the basement couch, alone, when Appellant came down and started touching her under her shirt. [N.T., 2/19/2020 p. 40]. Appellant bent D.J.'s body over the arm of the couch, pulled her pants down to her ankles, and put his penis inside of her anus,

---

[1] In order to protect the identity of the victim, her initials, D.J., will be used throughout. Where possible, the initials of all family members will also be used.

2

which caused her pain. [N.T., 2/19/2020 p.41- 43]. As he was doing this, D.J., heard Appellant making a grunting noise. [N.T., 2/19/2020 p. 41]. When he finally stopped, Appellant grabbed some paper towels and walked upstairs to the kitchen. [N.T., 2/19/2020 p.42].

The second time that Appellant abused D.J., she was in the kitchen. [N.T., 2/19/2020 p.43]. Although she doesn't remember exactly what day it was, D.J., was standing in the kitchen leaning over a small counter. [N.T., 2/19/2020 p. 44]. Appellant came into the kitchen, walked behind D.J., and lifted up her shirt, kissed he back of her neck, and pulled down her pants. [N.T., 2/19/2020 p.44]. From behind, Appellant put his penis into D.J.'s anus and then into her vagina, which was incredibly painful for her and she repeatedly told him that it hurt. [N.T., 2/19/2020 p. 46]. Appellant was grunting and kept telling D.J., to moan for him. [N.T., 2/19/2020 p. 47]. D.J., repeated how much it hurt and Appellant eventually stopped. [N.T., 2/19/2020 p. 47]. Not only was it painful but the vaginal penetration scared her because her grandmother is a very religious woman and has always taught her that premarital sex is a sin. Because of that, D.J., thought that she was going to be in a lot of trouble and go to hell. [N.T., 2/19/2020 p.45].

On a third occasion, the abuse occurred in the living room of the home. [N.T., 2/192020 p. 49]. This time, Appellant told D.J., to rub his penis with her hands. [N.T., 2/19/2020 p.50]. Appellant then told D.J., to get on her knees, and put his penis in her mouth [ N.T., 2/19/2020 p. 50-52]. Appellant told her she was doing it wrong and to stop biting and suck it like a popsicle. [N.T., 2/19/2020 p. 52]. After a bit, Appellant told her to it was enough and to stop. [N.T., 2/19/ 2020 p. 53]. It wasn't painful, but it was humiliating. [N.T., 2/19/2020 p. 52]. D.J., did discuss the abuse with Appellant on one occasion and asked him if he felt "a certain way" because she was so young, to which Appellant responded, "since you act grown up, that is how I will treat you." [N.T.,

3

2/19/2020 p. 57]. Appellant told her that if anyone ever found out, they would both in a lot of trouble. [N.T., 2/19/2020 p.58].

For approximately two years following the last incident, D.J. remained quiet and did not tell anyone for fear of getting in trouble and because she just wanted to forget about what had happened to her. [N.T., 2/19/2020 p. 59, 64]. However, in December of 2018, when D.J., was thirteen it became too much to bear on her own. She found herself becoming really closed off and had a hard time trusting other people; she also felt guilty for lying to her friends and family. [N.T., 2/19/2020 p. 67]. While on the phone with her father one evening, he asked her several times if something was wrong and if she was okay; she lied and said she was fine but felt guilty for lying to him. [N.T., 2/19/2020 p. 75]. When she hung up the phone, her mother asked her if she was okay; she said she was not but that she did not want to talk about it. [N.T., 2/19/2020 p. 66]. After that conversation, it felt like too much of a burden to keep to herself, so, in gym class at school, she told her friends, including her best friend, M.G., what had happened. [N.T., 2/19/2020 p. 66]. Her friends immediately told the gym teacher, Ms. Lauren Aherns that D.J., needed to talk to her. [N.T., 2/19/2020 p. 66]. After telling Ms. Aherns, D.J., also spoke with Officer Jones of the Chester Police Department and had a child interview with Ms. Susanne Whiting at the Child Advocacy Center of Delaware County, which was a recorded session in January of 2019. [N.T., 2/19/2020 p. 90, 137]. Since her disclosure of the abuse, D.J., has lost any relationship with her aunt. [N.T., 2/19/ 2020 p. 84].

## PROCEDURAL HISTORY

The Commonwealth proceed on the following counts: Count 1: Rape of a Child (F1); Count 3: Involuntary Deviate Sexual Intercourse with a Child (F3); Count 4: Sexual Assault (F2); Count 5: Indecent Assault Person Less than 13 Years of Age, Course of Conduct (F3); Count 8:

4

Corruption of a Minor (M1); Counts 2, 6 and 7 were withdrawn by the Commonwealth prior to the start of trial. [N.T., 2/18/2020 p. 5].

At trial, Ms. Lauren Ahrens, testified that she is employed at Talleyville Middle School, in Wilmington, Delaware, where she is the seventh and eighth grade physical education teacher. [N.T., 2/19/2020 p. 149]. D.J., was a student in Ms. Ahrens gym class both this year and the year prior. [N.T., 2/19/2020 p. 149]. Last year, during gym class, a group of female students approached Ms. Ahrens, one of those students was D.J., who was quiet and appeared uncomfortable. [N.T., 2/19/2020 p. 149]. The other girls in the group kept telling Ms. Ahrens that D.J., had something to tell her. [N.T., 2/19/2020 p. 149]. Ms. Ahrens told D.J., that she could tell her anything, but she shouldn't feel forced if she didn't want to. [N.T., 2/19/2020 p. 149]. Eventually, towards the end of class, D.J., approached Ms. Ahrens with another student. The student told Ms. Ahrens that D.J., had been raped. [N.T., 2/19/2020 p. 150]. Ms. Ahrens looked at D.J., and asked her if it was true, to which D.J., nodded her head in a "yes" motion. As she was doing this, Ms. Ahrens observed that D.J., looked very sad. [N.T., 2/19/2020 p. 150]. Ms. Ahrens immediately went to get the school counselor, Michelle Skelly. [N.T., 2/19/2020 p. 150].

Michele Skelly testified that she is the school counselor at Talleyville Middle School and that she had occasion to speak with D.J., as a result of what occurred in Ms. Ahren's gym class. [N.T., 2/19/2020 p. 154]. Ms. Skelly and D.J., spoke in her office, where she told Ms. Skelly that she had been raped by her aunt's boyfriend, at her grandmother's house. [N.T., 2/19/2020 p. 154]. D.J., was very quiet when she was talking, kept her head down and didn't make eye contact. [N.T., 2/19/2020 p. 156]. Ms. Skelly asked D.J., if "his private area went into her private area" [N.T., 2/19/2020 p. 155]. Based upon her training and the affirmative answer given by D.J., Ms. Skelly

5

knew that she had to contact the school's resource officer. [N.T., 2/19/2020 p. 156]. The resource officer, who is a Wilmington State Trooper, spoke with D.J., in private. [N.T., 2/19/2020 p.158].

R.P., (D.J.'s mother) testified that the first time she heard of the abuse was from the school. [N.T., 2/19/2020 p. 160]. On December 21, 2018, which she recalls was the very last day of school going into the Christmas break, she received a call from Ms. Skelly, who informed her that she needed to come down to the school because her daughter needed to tell her something. [N.T., 2/19/2020 p. 160]. When she arrived, D.J., seemed very uncomfortable and reluctant to talk. [N.T, 2/19/2020 p. 161]. A few days later, when D.J., was at home in her room, R.P., decided to see if D.J., would open up more about what had occurred. [N.T., 2/19/2020 p. 161]. D.J., told her that Appellant had anal sex with her on multiple occasions and that she was downstairs on grand mom's basement couch during the first time and that it continued sporadically between the ages of 8 and 11. [N.T., 2/19/2020]. D.J., also told R.P., that Appellant would tell her things about sex and body parts and touching. [N.T., 2/19/2020 p. 163]. D.J., told her that, since the abuse, she doesn't like talking about it and she feels like everyone in the family is choosing sides. [N.T., 2/19/2020 p. 165]. D.J., told R.P., that she finally told because she didn't want it happening to anybody else. [N.T., 2/19/2020 p. 165].

Officer Jennifer Jones of the Chester City Police Department testified that she has been employed with the Department for approximately twenty years. [N.T., 2/19/2020 p. 174]. Her current position with the Department is Investigator with the Juvenile Division, which includes conducting investigations with cases concerning children eighteen and under, whether it be a victim or an offender. [N.T., 2/19/2020 p. 175]. In December of 2018, the Chester City Police Department received a call from the school resource officer at Talleyville Middle School in Delaware with regard to an allegation of child sexual abuse that had occurred in Chester, Delaware

6

County. [N.T., 2/19/2020 p. 176]. Officer Jones was assigned and conducted an investigation wherein she spoke with the involved parties at Talleyville Middle School; statements were taken from Ms. Skelly, and Ms. Aherns. [N.T., 2/19/2020 p. 179]. Officer Jones scheduled an interview between D.J., and the Child Advocacy Center, which was recorded. [2][N.T., 2/19/2020 p. 180]. Officer Jones also interviewed Appellant, and D.J.'s aunt, R.G., as well as D.J.'s grandmother, S.G. [N.T., 2/19/2020 p. 181-182]. Officer Jones also interviewed D.J.'s friends, M.G. and A.T., as well as D.J.'s mother, R.P. [N.T., 2/19/2020 p. 183]. After the investigation, Officer Jones presented the information to the Office of the District Attorney, and charges were filed against Appellant. [N.T., 2/19/2020 p. 184].

During the testimony of Officer Jones, the Commonwealth asked the following question: "did you interview the victim's mother?" Defense objected to the use of the term "victim." The Court gave the following cautionary instruction "ladies and gentlemen, at this point in time, they're simply allegations, okay? So, we have a person that's made a compliant, a complainant, and we have the alleged accused. [N.T., 2/19/2020 p. 183].

The defense called D.J.'s aunt, R.G., as well as Appellant during its case-in-chief.

D.J.'s aunt, R.G., testified that she is currently twenty-four years old and resides on East 12th Street in Chester, with her mother and Appellant [N.T., 2/19/2020 p. 205]. R.G., and R.P., are sisters, which makes R.G., the aunt of D.J. [N.T., 2/19/2020 p. 209]. According to R.G., D.J., and her brothers did not visit that often, maybe twice a year. [N.T., 2/19/2020 p. 211]. According to R.G., Appellant and one of D.J.'s brothers were best buddies and played video games together.

---

[2] The recording was played for the jury at trial.

[N.T., 2/11/2020 p. 214]. At no time was D.J., alone with Appellant and there was always a large number of people in the home. [N.T., 2/19/2020 p. 215].

D.J.'s grandmother, S.G., testified that she has been residing at the Chester address since August of 2014. [N.T., 2/19/2020 p. 225]. S.G., described the layout of the home. [N.T., 2/19/2020 p.226]. S.G. testified that Appellant and D.J., were never alone together, that she knows of. [N.T., 2/19/2020 p, 229].

After a thorough colloquy, Appellant elected to testify. [N.T., 2/19/2020 p. 200-203] [N.T., 2/20/2020 p. 3]. Appellant testified that he is currently twenty-six years old and that he did not have any inappropriate encounters with D.J. [N.T., 2/20/2020 p. 6]. Appellant testified that he didn't really have any interaction with D.J., until 2015 when he started a bond with D. J's oldest brother and eventually her younger brother who liked the same video games that Appellant did. [N.T., 2/20/2020 p. 9]. After that, Appellant started to have a friendship with D.J., who thought he was funny. [N.T., 2/20/2019 p. 11]. Appellant testified that he and D.J., would walk alone to the store together. [N.T., 2/20/2019 p. 11].

As a rebuttal witness, the Commonwealth re-called R.P., who testified that she and the children would visit grandmother's house on a regular basis between the years of 2013 through 2016, when they eventually moved to Wilmington. [N.T., 2/20/2020 p. 19].

During the rebuttal testimony of R.G., the Commonwealth asked the following question: "And what's the victim's relationship with---" to which the defense objected to the term victim. The Commonwealth rephrased the question, and again, the Court provided the following cautionary instruction, "ladies and gentlemen, as I said, Mr. Thomas, is accused of a crime, okay,

and Ms. D.J., is the complainant in the crime, so you have to differentiate at this point in time because you the jurors have not made a determination." [N.T., 2/20/2020 p. 21].

During closing arguments, Attorney Daniel, specifically referenced the prosecution's use of the phrase "victim." [N.T., 2/20/2020 p.35]. Attorney Daniel argued that the Commonwealth used that particular term on purpose. [N.T., 2/20/2020 p.35].

During the Commonwealth's closing argument, D.J., was referred to as the victim on a few occasions. [N.T., 2/20/2020 p. 67]. After the Commonwealth finished, Attorney Daniel asked for a sidebar wherein he moved for a mistrial based upon the use of the word victim and because the Commonwealth made a reference to childhood trauma suffered as a result of rape, that he believed would have required expert testimony. [N.T., 2/20/2020 p. 67].

The request for a mistrial was denied. This Court found that the use of the victim during the closing was not evidence, just argument, and the instances during trial where the defense objected to the term , the Court provided a cautionary instruction which clearly explained that the use of the term should not be used to infer guilt. [N.T., 2/20/2020 p. 69].

After deliberations, the jury rendered the following verdict:

> Count 1: Rape of a Child (F1): Guilty
> Count 3: Involuntary Deviate Sexual Intercourse with a Child (F3): Guilty
> Count 4: Sexual Assault (F2): Guilty
> Count 5: Indecent Assault, Person Less than 13 Years of Age (F3): Guilty[3]
> Count 8: Corruption of a Minor (M1): Guilty.

Prior to sentencing, a Psychosexual Evaluation was completed on February 27, 2020; a Psychological report was completed on March 27, 2020, and a Pre-Sentence Investigation Report

---

[3] With regard to Count 5, the jury also was posed with the following fact question: "do you find beyond a reasonable doubt that there has been a course of conduct of indecent assault by the defendant? The jury answered YES on the line provided.

was completed on April 14, 2020. Both parties submitted sentencing memorandums for this Court's review.

A sentencing hearing was held on May 29, 2020. The hearing had originally been scheduled for April 27, 2020; however, due to the emergency closure of the Court's due to the pandemic, the hearing was moved to May 29, 2020, wherein Appellant appeared via audio visual. Appellant was sentenced to an aggregate term of 14-to-28 years of incarceration as well as 7 years of consecutive probation, to terminate after 3 years if all conditions were complete and there were no violations. Appellant was also required to comply with any psychosexual evaluations, complete state sex offenders' program, and to comply with all recommendations. Appellant was given credit for time served. Appellant was ordered to have no contact with the victim and to register as a Tier 3 registrant under Meghan's Law.

A post-sentence motion was filed on June 4, 2020 and a hearing was held on June 30, 2020. After review, this Court issued an Order on July 16, 2020, denying the requested relief. A timely notice of appeal followed. On September 4, 2020, counsel for Appellant filed a 1925(b) statement which raised the sole issue of the trial court's failure to grant the defense Motion for a Mistrial. Although contained within one sentence, the argument purports to be based upon two separate instances: one, based upon the Commonwealth's use of the word "victim" during closing and, two, the Commonwealth's remark about childhood trauma was a fact not in evidence and could only have been put into evidence by an expert witness.

## DISCUSSION

**THE DENIAL OF APPELLANT'S REQUEST FOR A MISTRIAL WAS NOT AN ABUSE OF DISCRETION.**

"The **remedy of a mistrial is an extreme one.** It is primarily within the trial court's discretion to determine whether Appellant was prejudiced by the event that forms the substance of the motion. It must be remembered that a mistrial is required **only** when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." *Commonwealth v. Risoldi,* 2020 PA Super 199, 18 (Aug. 18, 2020) (emphasis added).

"A mistrial is not necessary where the cautionary instructions are adequate to overcome any possible prejudice; juries are presumed to follow the trial court's cautionary instructions." *Id.* citing *Commonwealth v. Fletcher,* 41 A.3d 892, 896 (Pa. Super. 2012) (holding that a mistrial was properly denied when, during a two-day jury trial with multiple eyewitnesses, the Commonwealth asked an improper question on cross-examination and a cautionary instruction was issued).

To assess a prosecutor's closing argument, courts must evaluate both the substance of the challenged remark and its effect upon the jury. *Commonwealth v. Clancy,* 648 Pa. 179 (2018).

Appellant's first contention in support of his allegation that he did not receive a fair trial is that he was unduly prejudiced by the prosecutor's use of the word "victim" and not the word "complainant" in her closing argument when referring to D.J. According to Appellant, the use of the word was so unduly prejudicial that the jury was incapable of rendering a fair and impartial verdict. Appellant's argument lacks merit on multiple levels.

The jury heard this Court give two cautionary instructions during trial explaining that the Commonwealth may use the word victim to describe D.J., but that the case involved a complainant and the accused. As juries are presumed to follow a court's cautionary instructions, it is incredulous

11

to believe that the jury did not apply the same logic to the use of the word during the closing argument. Over the course of two full days and hours of testimony, it is illogical to infer that all twelve men and women of the jury were so swayed by the word use of the word "victim" that they could not render a fair verdict. In addition, the Court instructed the jury that closing argument from the attorneys was not evidence. The Commonwealth's theory of the case is premised around the notion that D.J., is a victim of a crime committed by Appellant. It was not improper for the Commonwealth to argue its theory of the case during closing argument.

Although sufficiency of the evidence was not raised on appeal, it bares noting that the jury heard D.J. testify. They jury heard a child talk about her innocence being stolen, how Appellant groomed her over the weeks prior with talk of sexual topics and how men and women liked to touch and how sex felt good. The jury heard the victim describe, in detail, how it felt when he penetrated her, how he was grunting, and how scared she was that she would get int trouble if she told. Her testimony was credible and real and powerful. The use of the word victim did not convince the jury to find Appellant guilty; the overwhelming testimony given by D.J., convinced the jury beyond a reasonable doubt.

It was within this Court's discretion to determine whether or not a mistrial was warranted. There is not a scintilla of evidence that would have supported this Court using such an extreme measure as the cure for the use of the word "victim" in a criminal trial. Appellant fails to demonstrate how the word had such an unavoidable effect as to deprive him of a fair and impartial trial.

Appellant also claims that this Court erred in failing to declare a mistrial because of the Commonwealth's mention that children of abuse often suffer trauma as a result, much like D.J., when she testified that she felt detached from her family and friends and that she felt like she was

12

lying to everyone and had a hard time trusting others. Appellant argues this comment was a fact not in evidence as there was no expert testimony presented as to childhood trauma as a result of sexual abuse.

First, Appellant's argument is factually inaccurate. During D.J.'s., testimony, she explained to the jury how the years of being raped, especially by someone so close to her family, negatively impacted her social, emotional, and physical health. D.J., explained the agony she felt lying to her family, the shame she felt from the rape, how scared she was that she would get in trouble, and the detachment from family and friends. D.J.'s mother explained how the family has been torn apart, forced to pick sides, and how that has a negative impact on D.J., who was once so close with her aunt. The Commonwealth's comment was simply an argument in support of D.J.'s credibility, during a time where the jury was instructed that the prosecutor's words were simply argument and not even to be considered evidence.

In addition, Appellant argues that such facts could have only been put into evidence during trial by an expert witness. *Pa. R. Evid. 702*, governing expert witness testimony states, "a person who is qualified as an expert by knowledge, skill, experience, training or education may testimony in the form of an opinion or otherwise if: (a) the expert's scientific, technically, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field. *Commonwealth v. Nevels*, 203 A.3d 229 (Pa. Super. 2019).

This Court does not disagree that there are some instances wherein the emotional, mental, or physical wellbeing of a child, or any victim, would warrant the testimony of an expert. However, the extremely brief and inconsequential remark from the prosecutor that child victims often suffer

13

trauma is not an example of such a time. The prosecutor's remark was surface level and common sense. The jury did not need an expert witness to explain to them that D.J., suffered emotionally as a result of the rape. The remark was brief, generalized, and based upon testimony given by D.J., during trial and did not have an unavoidable effect that deprived Appellant of a fair and impartial trial.

## CONCLUSION

These were horrendous criminal acts committed by Appellant on an innocent child. The jury heard from a litany of witnesses, including Appellant, and had ample opportunity to evaluate the demeanor and credibility of those witnesses prior to rendering its verdict. The use of the word "victim" by the Commonwealth was inconsequential when examined in the full light of the testimony, notwithstanding the cautionary instruction. Therefore, there was no error or abuse of discretion.

As to Appellant's contention that expert testimony was required to support the prosecution's argument that D.J., suffered trauma as a direct result of Appellant's actions, overlooks the obvious. It is without uncertainty that anyone who suffers abuse sustains trauma. Expert testimony is not required to state what is commonly understood and well known.

For the aforementioned reasons, this Court respectfully asks that Appellant's judgment of sentence be affirmed on appeal.

BY THE COURT:

JOHN P. CAPUZZI, SR.,                J.

14